THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES MCMAHON, Plaintiff in Error.

*Opinion filed February 16, 1910.*

1. CRIMINAL LAW—*what does not show that grand jury was not legally constituted.* The fact that the record of the board of supervisors in which the names of persons selected as grand jurors appear does not give their respective townships does not show that the grand jury was not legally constituted, where the certificate of the county clerk does state such townships and shows that no two of the grand jurors were from the same township.

2. SAME—*proof of condition of deceased's family is improper in murder trial.* In a murder trial it is error to permit the State's attorney to make statements and introduce proof to the effect that the deceased was one of five children and that the father was dead and the mother left with the other four children without means of support, as such matters have no bearing on the guilt of the accused and tend only to prejudice the jury against him.

3. SAME—*when proof of trouble between accused and his wife is improper.* In a trial for the murder of a girl employed in the family of the accused, proof that the accused and his wife did not get along well together and that he made disrespectful remarks about her is incompetent; and even though the evidence is stricken out, it is highly improper for the State's attorney to comment on it in his argument and insist that he differed with the court and that the evidence should have remained in, giving his reasons for his views in that respect.

4. SAME—*fact that the defendant did not testify should not be commented upon.* A State's attorney may, without violating the statute forbidding reference to or comment upon the fact of the defendant not testifying, refer to the testimony of the witnesses for the People and call attention to the fact that such testimony was not contradicted even though the defendant is the only person who could contradict it, but it is improper for the State's attorney to make use of such privilege for the purpose of calling the jury's attention to the fact that the defendant did not testify.

5. SAME—*State's attorney cannot assume facts not in evidence and base argument thereon.* While great liberty is permitted in the argument to the jury of the facts shown in evidence by the testimony in a criminal case, yet the State's attorney is not at liberty to assume or state as facts matters not in evidence and base an argument thereon.

6. SAME—*statements and explanations of State's attorney can not take the place of evidence.* Where the most damaging state-

ment by a witness against the defendant in a murder trial does not appear in the transcript of his testimony at the coroner's inquest and the stenographer who made the transcript testifies that she does not remember that such statement was made, it is proper to show by evidence, if it is a fact, that the statement was made but was omitted from the transcript, but it is error to permit the State's attorney's explanations, statements and arguments to take the place of evidence.

7. Same—*what action by State's attorney is reversible error.* Where the name of the wife of the defendant in a murder trial is endorsed on the indictment as a witness and the verdict of the coroner's jury recommending that both the defendant and his wife be held to the grand jury is read to the jury by the State's attorney, it is reversible error to permit comments by the State's attorney the effect of which is to inform the jury that the defendant's wife had been before the grand jury and that she had not been indicted, the inference being that her story exonerated her and placed the blame on the defendant, where it belonged.

8. Same—*remarks tending to show that defendant's wife is aiding prosecution are prejudicial.* Where it appears that a witness for the prosecution in a murder trial, who, when called by the defendant's counsel to prove the time of a certain transaction, testified at variance from her previous statement to the defendant's counsel, has refreshed her memory since her conversation with him by talking to someone in the State's attorney's office, it is prejudicial error to permit the State's attorney to remark that she had talked to the defendant's wife, thus giving the jury to understand that defendant's wife was at the State's attorney's office and aiding the prosecution.

9. Same—*what evidence is admissible in murder trial.* Where the theory of the prosecution in a murder trial is that the defendant poisoned the deceased in an attempt to conceal his previous unlawful relations with her, proof that the deceased, who was a young girl, was pregnant at the time of her death, and proof of circumstances tending to show that the defendant was or might have been the father of the unborn child, is admissible.

10. Same—*when proof of statements by the defendant's wife is not erroneous.* Proof of statements made by the defendant's wife to a doctor and another person in explaining how her attention was first called to the fact that something was the matter with the girl the defendant is charged with murdering and what the condition of the girl was when she was found by the defendant's wife is not erroneous, where there is nothing in such statements prejudicial to the defendant or in any way connecting him with a crime.

11. SAME—*when a new trial should be granted for misconduct of a juror.* Where the affidavits in support of a motion for new trial in a murder case clearly show that one of the jurors was prejudiced against the defendant when accepted, and that he not only concealed that fact but made untruthful statements in doing so, and no attempt is made to contradict such affidavits by a denial by the juror or counter-affidavits from any source, a new trial should be granted.

12. SAME—*court should preserve order and decorum at a trial.* While a trial is public hearing, which people have a right to attend as spectators, yet they must conduct themselves in an orderly manner and should not be permitted to manifest their prejudice or partisanship or give expression to their pleasure by cheering and clapping hands, and if such demonstration does occur it is the duty of the court to prohibit its repetition and resort to necessary means to preserve order and decorum.

WRIT OF ERROR to the Circuit Court of Bureau county; the Hon. EDGAR ELDREDGE, Judge, presiding.

CHARLES J. SEARLE, FRANK J. QUINN, and IRA C. GIBBONS, (SHELTON F. McGRATH, and IRVING WASSON, of counsel,) for plaintiff in error.

W. H. STEAD, Attorney General, LEONARD M. ECKERT, State's Attorney, and JUNE C. SMITH, (HOBART P. YOUNG, of counsel,) for the People.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error was indicted by the grand jury of Bureau county for the murder of Mary Hetrick. He was tried and convicted, sentenced to the penitentiary for twenty years, and has sued out this writ of error to review the judgment of conviction.

Plaintiff in error was a farmer, residing with his wife and two children on a farm belonging to H. L. Whiting, and had resided there at the time of the alleged crime several years. The owner of the farm, Mr. Whiting, reserved a room for his own use, which he occupied at the time of

the alleged crime and had been occupying the principal part of the time while plaintiff in error lived on the farm, and occupied other portions of the house. Mary Hetrick, the deceased, had lived in the family of plaintiff in error about two years before her death. During school months she attended school and was paid no wages. When there was no school she was paid wages and always assisted in the household duties. On the morning of December 5, 1908, she was in the kitchen preparing breakfast. Plaintiff in error had, gone out to the barn, and while his wife, in a room adjoining the kitchen, was dressing the children she heard an exclamation from Mary Hetrick which caused her to go into the kitchen and she there found the girl lying on the floor. She at once summoned her husband and Mr. Whiting. The girl appeared to be in convulsions, and after speaking to her and after some effort to revive her by putting water on her face by Mrs. McMahon, the plaintiff in error went to the telephone to summon Dr. Landis. Dr. Landis arrived at the house very shortly but the girl was dead when he arrived. He inquired about her actions and symptoms and how long she survived after they discovered the trouble, and upon being told by those present, stated that it looked like a case of strychnine poisoning. He inquired if there was any strychnine in the house. Plaintiff in error or his wife,—the doctor thought it was plaintiff in error,—said they had some strychnine. The doctor expressed a desire to see it, and plaintiff in error went to the pantry or cupboard in the kitchen, took the bottle with strychnine in it off the shelf and gave it to the doctor. The doctor inquired how long he had had it, and testified plaintiff in error replied he had procured it a year or two previous, for gophers. The proof showed a purchase by plaintiff in error of strychnine from a druggist in Tiskilwa on October 20, 1904, and the druggist testified he stated he wanted it to kill rats and signed a book kept by the druggist for that purpose. The coroner was

notified and held an inquest at the house of plaintiff in error. Dr. Landis conducted the autopsy at this inquest and it was found that Mary Hetrick was pregnant. The fœtus was taken from her and was from seven and one-half to eight months old. The verdict of·the coroner's jury at this inquest was that Mary Hetrick came to her death by suicide. The body was buried, but on the 15th of December was exhumed and another inquest held. Certain organs were removed, placed in glass jars, sealed, and sent to a chemist in Chicago for examination and report. The report of the chemist was submitted to the jury, a number of witnesses were examined, including the plaintiff in error and his wife, and the jury found by their verdict that Mary Hetrick came to her death from strychnine poisoning; that plaintiff in error and his wife administered the strychnine to her which caused her death, and the jury recommended that they be held to answer to the grand jury without bond. At the April term, 1909, of the circuit court of Bureau county the grand jury returned an indictment charging the plaintiff in error with the murder of Mary Hetrick by administering to her a deadly poison, to-wit, strychnine. The indictment contained five counts. Different methods of administering·the poison were charged in four of the counts, and one of them charged it was administered in some manner and by some means unknown to the grand jurors. The plaintiff in error was also indicted for committing rape upon the person of Mary Hetrick. No indictment was returned against plaintiff in error's wife, but her name was the first endorsed on the back of the indictment as a witness.

As this case must be reversed for errors committed during the trial we shall not comment upon the weight or sufficiency of the evidence, nor set it out further than is necessary in passing upon the errors assigned to be noticed by us in this opinion. At the time of Mary Hetrick's death she was two or three months past sixteen years of age, and the theory of the prosecution was that plaintiff in error

was the father of her unborn child and murdered her to conceal his relations with her.

Herbert L. Whiting testified he owned the farm on which the plaintiff in error and his family resided and that they had resided there about seven years. The witness occupied a bed-room on the first floor of the residence but did not board or take his meals with the plaintiff in error's family. The family of plaintiff in error consisted of his wife and two children,—one six and one three years old. They and their parents occupied a bed-room on the first floor of the residence, on the north side and adjoining the dining room. The kitchen adjoined the dining room on the south. Mary Hetrick, the deceased, occupied a bed-room on the second floor, over the dining room, and James Currens, plaintiff in error's hired man, occupied a bed-room on the second floor, adjoining and east of Mary Hetrick's room. The witness testified that he retired Friday evening, December 4, about seven o'clock and arose next morning about seven o'clock; that Mrs. McMahon rushed into his room and he followed her into the kitchen; that Mary Hetrick was on the floor; that plaintiff in error entered the kitchen from the opposite door at the same time witness did; that Mary Hetrick's hands were drawn up and every nerve was quivering. Witness remarked she had a fit and asked that a doctor be called. The plaintiff in error wanted to put her on the bed, but witness objected. Plaintiff in error went to the telephone to call Dr. Landis, and witness took the receiver from his hands and told the doctor to come as quick as he could. Plaintiff in error said Mary was dying, and called her three times by name, Mary, and said to witness, "My God! what will they do to us if we let Mary die?" or, "What will we do if little Mary dies?" Witness said she was not going to die. Plaintiff in error again insisted on placing Mary on the bed, and this was done, the witness assisting him. Her body was stiff as a board. The witness stepped out to look for the

doctor, and when he went back in the room said he believed Mary was dying. Witness felt her pulse and pronounced her dead. He inquired of Mrs. McMahon how the matter happened. Plaintiff in error was present, and Mrs. McMahon said she didn't know; that she was dressing the little boy by the stove in the dining room and he objected to being dressed; that she called Mary, who was in the kitchen, to bring the whip; that Mary brought the whip, but the boy promised to be good and she took the whip back into the kitchen; that she continued to dress the boy, and in a few minutes heard Mary in the kitchen say, "God help me!" that she rushed into the kitchen and inquired of Mary if she was sick; that Mary was lying on the floor and said her head was dizzy; that she (Mrs. McMahon) sprinkled some water on her face, got some holy water and applied it, and told Mary to say her prayers and bless herself; that Mrs. McMahon said she then ran to the barn to get plaintiff in error. Mary was dead when the doctor arrived, but the witness testified that Mrs. McMahon told him of the circumstances of her death in substance the same as she had told the witness before the doctor arrived; that the doctor said it looked like a case of strychnine poisoning, and inquired if there was any strychnine in the house; that Mrs. McMahon said there was, but she didn't know whether Mary knew of it; that plaintiff in error and his wife went into the pantry to look for the strychnine and the witness saw a bottle in the hands of one of them; that plaintiff in error said the strychnine had been in the house several years. The witness went some three miles to notify Mary Hetrick's mother. Before starting he telephoned for the coroner, and when he returned the coroner was at the house. It was then discovered that Mary Hetrick was pregnant. A search by the witness, and others, of Mary Hetrick's room failed to disclose any bottle of poison. Some time after the coroner's inquest the witness testified he took some aconite, paris green and a bottle of strych-

nine from the pantry and turned them over to the State's attorney. A few days after the funeral, the witness testified, he told plaintiff in error he was not satisfied with the verdict of the coroner's jury; that he didn't believe the girl had committed suicide and would like further investigation, and plaintiff in error said he would also but for his wife, and that he didn't want any more coroners around the place; that at a subsequent time plaintiff in error inquired of the witness if he thought some one could give the State's attorney $15 or $20 to prosecute him, and the witness replied he didn't think the wheels of the law could be started for such an amount of money. This was before the second inquest, which was about the middle of December. The witness was present when the body was exhumed and identified it. The witness testified that plaintiff in error's wife was at her husband's father's in January, 1908, a week or ten days, and was asked if he observed at any time how plaintiff in error and his wife got along together. Objection to this was sustained. The witness was asked by counsel for the State if he paid any part of the funeral expenses, and answered he did, before objection was made. Upon objection being made to this testimony it was sustained. He was then asked if he had any talk with plaintiff in error about that matter, and answered that he did; that the day after Mary's death he told plaintiff in error he would like to see her given a decent burial; that $12 wouldn't do it; that $25 added to the $12 that the county would pay would give her a decent burial. The witness said that he proposed that he, plaintiff in error and the father of plaintiff in error add the $25, each paying one-third thereof; that plaintiff in error said he would do so, and the undertaker was so informed. The witness testified he paid his share of the $25.

James Currens testified he was thirty-seven years old, unmarried, and a farm hand by occupation; that he worked in that capacity for plaintiff in error from March, 1908,

until the 15th of June following, during which time he lived in the house occupied by plaintiff in error and his family; that Mary Hetrick lived there during that period; that after her burial he met plaintiff in error in the village of Tiskilwa, and plaintiff in error asked witness if he could swear he (plaintiff in error) did not poison Mary Hetrick; that witness replied he could not; that plaintiff in error asked why, and witness said he would not swear to a lie for all the money plaintiff in error and his father had; that plaintiff in error invited him to come to his house to see him, and on the Saturday following witness did so and remained there until the 15th of December, when he was taken to Princeton by the sheriff and coroner. The witness testified that on the 14th of December plaintiff in error stated that Whiting told the priest to bury little Mary in the Catholic burying ground; that he knew she had not taken her own life; that "he (plaintiff in error) said he didn't see why the old son of a bitch ever went down, and said he was no Catholic; that he was sitting on one end of the lounge and I was sitting on the other and his wife was around by the stove, and he turned around and he rubbed his hands and he says, 'If I thought that fellow was like to squeal anything on me I would give him the same dose I gave the other little bitch;' I don't know whether he meant me or Mr. Whiting; I shivered all over, just like a man that had the ague." The witness testified that some time in the month of April, while he was working for the plaintiff in error, they were in the barn together when Mary Hetrick passed through, looking for eggs; that the plaintiff in error, using a vulgar term, said he would have intercourse with her if he was not afraid she would "squeal" on him. On cross-examination the witness testified that two or three days after the statement he testified plaintiff in error made about what Whiting had told the priest, and his threat in connection with it, he (witness) was examined before the second coroner's jury and did not

know that he related this incident; that he couldn't say whether he did or not. On re-direct examination the witness testified that the day before his examination was concluded before the coroner's jury, on his way from Tiskilwa, where the inquest was begun, to Princeton, where it was completed, he rode in an automobile with the coroner, sheriff and State's attorney, and that he then told them about the statement and threat made by plaintiff in error above referred to, and that he thought he also told it to the jailor.

Grace Rogers, a witness for plaintiff in error, testified she was a stenographer in the State's attorney's office; that she took the testimony before the coroner's jury; that the transcript of what purported to be Curren's testimony was furnished by her to counsel for plaintiff in error, and it did not appear from it that Currens had testified to the statement and threat made by plaintiff in error which he testified to on the trial. The witness was then asked if Currens testified that plaintiff in error said, "I will give him the same dose I gave the other little bitch." The State's attorney objected, and said: "You can blame it on to me; I knew it a long time ago; I told her to leave lots of that stuff out." The witness answered that she did not remember his giving such testimony, and that she didn't remember the State's attorney told her to leave out any expressions Currens testified plaintiff in error made.

A motion was made to quash the indictment on the ground that the grand jury that found and returned it was not a legally constituted grand jury. The objections urged in support of this error are: (1) That the grand jury was not selected at a legal meeting of the board of supervisors; (2) no quorum of the board of supervisors is shown by the record to have been present; (3) it is not shown by the record that a proportionate number of grand jurors were chosen from each township; (4) the record does not show the township in which each of the grand jurors chosen resided. The record shows the board convened in annual

session on September 8, 1908, and recites that twenty-six members (naming them) were present, none noted absent. Without going into detail, it is clear this meeting was kept alive by adjournments until February 9, 1909, when the board met pursuant to the last adjournment. On February 9 the board adjourned to meet at nine A. M. the following day. The record shows that all members were present on February 10 except three, and on that day the grand jurors were selected. The record of the board of supervisors then recites the names of twenty-three men selected as grand jurors, but in connection with their names their addresses are not given. On the 11th of April the county clerk certified to the circuit court the names of the persons selected by the board of supervisors as grand jurors, and also their addresses and townships. Summons was duly issued to the sheriff by the clerk of the circuit court for the same persons selected by the board of supervisors and certified by the county clerk, and the summons gave the address and township of each of the said grand jurors. Under this record we think the meeting of the board of supervisors was a legal meeting, and if it were necessary that the record show a quorum present, it is so shown by the record. While the record of the board of supervisors in which the names of the persons selected as grand jurors appear does not state their respective townships, the certificate of the county clerk does state them, and no two of the jurors were from the same township. They were summoned properly and in our opinion constituted a legal grand jury.

It is also claimed the court erred in not sustaining the plaintiff in error's motion to quash the array of the petit jury. As this case is reversed on other grounds and the same objections are not likely to occur again, that alleged error will not be discussed.

In his opening statement to the jury, assistant counsel to the State's attorney said it would be proven on the trial

that Mary Hetrick was the second of five children left half orphans with their mother, who had no means of support. This was objected to but the objection was overruled, and it was substantially repeated by counsel to the jury. Mary Hetrick's mother was placed on the stand by the prosecution, and was permitted, over objections, to testify that her husband (Mary's father) was dead, and that besides Mary she had four other children, Mary being the second in age. The witness did not state, in terms, that she was left a widow with five children without any means of support, but her examination tended to show that she was left with but little, if any, means. Counsel in his opening statement also said it would be proven by the prosecution that plaintiff in error advised the coroner that the county would pay the burial expenses of Mary Hetrick, and that the coroner objected and said it would not look well. Objection to this statement by counsel for plaintiff in error was sustained, but the witness Whiting was allowed to testify for the prosecution on this subject, to the statements set out above in his testimony. Counsel also stated the prosecution would show by the proof that plaintiff in error and his wife did not get along well together; that at one time he told Whiting his wife was sick at his father's and he didn't care a damn if she never came back; that at another time he told Currens he would not have married his wife but he had to; that it would be proven for the prosecution that in April the plaintiff in error struck his wife and blacked her eyes. Currens testified, not in direct response to questions, that the plaintiff in error asked him to not tell anything to the coroner's jury about trouble between himself and wife; that Mrs. McMahon had a black eye at one time, and upon witness inquiring how she got it, she said she and her husband had a scuffle and he had hit her with his elbow. This latter statement was, on motion of counsel for plaintiff in error, stricken out, and as we understand the record, although it is not very clear from the imperfect abstract pre-

sented, all testimony relating to trouble between plaintiff in error and his wife was stricken out.

That the deceased was one of five children and that by their father's death her mother was left without any means of support could not possibly throw any light upon the guilt or innocence of the plaintiff in error of the crime charged. In *Filippo* v. *People,* 224 Ill. 212, proof that the deceased was married and had five children was held to be erroneous. The court said such proof had nothing to do with the guilt or innocence of the defendant or the punishment to be administered to him, and that its only effect was to prejudice the jury against him. This proof was calculated to prejudice plaintiff in error in the minds of the jury, as was also the statement of counsel and the proof as to the talk between plaintiff in error and the coroner and Whiting about the county burying the deceased. The statement of counsel for the prosecution that it would be proven the plaintiff in error and his wife did not get along well together, and that he had made certain disrespectful remarks about her, was improper and must have tended to prejudice the jury against plaintiff in error. The objection to this statement by counsel in his opening was sustained by the court, but testimony in support of that statement was given by one or more witnesses. On motion of counsel for plaintiff in error it was stricken out, but it cannot be said that the injury caused by it was therefore removed. The State's attorney, in his closing argument to the jury, referred to the statement in the opening that the prosecution would prove the relations between plaintiff in error and his wife were not harmonious, and said counsel for the prosecution believed when that opening statement was made, and still believed, such evidence was competent and proper, and that he differed with the court on that subject, and he proceeded to give counsel's theory why the evidence should have been admitted. The State's attorney said, at the close of his comments on that subject, "If it has not got a place

here, cut it out;" that the opening statement to the jury
had been presented by counsel for plaintiff in error, and
what he had said was in response to what counsel for plain-
tiff in error had done. We think the comments by the
State's attorney went far beyond the legitimate limits of a
reply to statements made by opposite counsel. This would
only have required the State's attorney to assure the jury
that the offer to make the proof in the opening statement
was made in good faith and in the belief that it was com-
petent and material, but the court having ruled otherwise,
the offer to make the proof, and the testimony upon that
subject which was stricken out by the court, should be dis-
regarded by the jury. The jury had heard substantially
from the witness stand what counsel in his opening state-
ment said would be proven upon this subject, and although
it was stricken out by the court, the State's attorney told
the jury he thought the court was wrong, and substantially
argued what he considered the effect and value of this
testimony. Such conduct would be highly improper in any
case, but it is especially so in a criminal case involving the
life and liberty of the accused.

It is insisted by plaintiff in error that the conduct of
the State's attorney in his closing argument was also im-
proper in other respects and constituted prejudicial error.
The plaintiff in error did not testify on the trial, and it is
claimed this fact was taken advantage of and referred to
by the State's attorney in his closing argument to the jury.
It is not claimed the State's attorney directly called atten-
tion to the failure of plaintiff in error to testify, but that
this was the effect of his argument in referring to the fact
that the testimony of two witnesses to statements or con-
duct of plaintiff in error had not been disputed by anyone.
In commenting on the testimony of Currens as to the state-
ment he testified plaintiff in error made at his house, in
the presence of witness and plaintiff in error's wife, about
what he would do if he thought "that fellow was going to

squeal anything on him," the State's attorney said Mrs. McMahon heard it but was an incompetent witness, and continuing his argument said: "Has it been denied? Has it been disputed? * * * There has been no disputing of it by any man or woman or any individual on the face of the earth. It stands. It is the evidence in this case. You can't get away from it. It has not been denied. It has not been disputed. There isn't anything to the contrary." Referring to the testimony of Macy Hamrick as to some conduct of plaintiff in error on one occasion, the State's attorney said: "Is there a man or woman on earth that ever came in here and contradicted her in the least? No, sir."

The statute prohibits reference to or comment upon the neglect of a defendant in a criminal case to testify, and the disregard of this statute is reversible error. In the case under consideration the State's attorney did not directly and specifically refer to the fact that plaintiff in error had not testified, but it is argued that the reference quoted, to the effect that certain testimony had not been disputed or contradicted when the proof showed there was no one who could have contradicted it but plaintiff in error, was as much a violation of the statute as if reference had been made in direct terms to his failure to testify. If this were the most serious objection to this record we would not be disposed to reverse for that reason, although we regard the argument of the State's attorney as near the danger line. He had the right to refer to and comment on the testimony of the witnesses for the prosecution and call the jury's attention to the fact, where such was the fact, that their testimony had not been contradicted or disputed, even though plaintiff in error was the only person who was in a position to have disputed such testimony. It would, however, be improper, in doing this, to make use of the privilege for the purpose of calling the jury's attention to the fact that the defendant himself had not taken the wit-

ness stand to deny the testimony. In *Watt* v. *People,* 126 Ill. 9, this court said: "Indirect and covert references to the neglect of the defendant to go upon the witness stand may be as prejudicial to his rights as a direct comment upon such neglect. But it does not necessarily follow that every reference to the law on that subject is prohibited. The true test would seem to be, was the reference intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify?" In *Lipsey* v. *People,* 227 Ill. 364, the court said: "By refusing to testify a defendant cannot prevent the State's attorney from commenting upon the evidence and pointing out to the jury the legitimate conclusions to be drawn therefrom."

A much more serious complaint is made to the remarks of the State's attorney when Grace Rogers, the stenographer who took the testimony at the second coroner's inquest, was being examined as to whether James Currens testified at that inquest to plaintiff in error's statement as to what he would do if some one "squealed" on him, and his remarks in his closing argument to the jury on the same subject. It not appearing from the transcript of the testimony made by the witness Grace Rogers that Currens had testified to that statement before the coroner's jury, the State's attorney interrupted the examination by counsel for the plaintiff in error and said, in the presence of the jury: "You can blame it on to me; I knew it a long time ago; I told her to leave lots of that stuff out." In his closing argument the State's attorney told the jury that the stenographer's notes were not complete; that he told her, while the testimony was being given, not to take down certain things because they were not for the public, and that the statement Currens testified on the trial plaintiff in error had made was not put in the record. Continuing his argument, the State's attorney said Currens testified he had told this statement to the sheriff, coroner and State's at-

torney in the automobile on the way to Princeton. Plaintiff in error put the coroner on the witness stand and inquired of him if he had heard Currens make said statement. The witness testified that he had not; that he rode in the front seat of the automobile, and Currens, the sheriff and State's attorney were in the rear seat. The State's attorney in his argument inquired why he and the sheriff were not called to contradict Currens, and said: "Gentlemen of the jury, you have got to believe this statement as true. It is true in every sense of the word, and the testimony is in the court house now that could have substantiated it. * * * He told us his story. He told us his story." The only purpose and effect of these remarks of the State's attorney was to take the place of evidence in explaining the absence from the stenographer's transcript of the testimony of Currens,—the most damaging thing to plaintiff in error testified to by him. That this could only properly be done by testimony in the regular way, and not by statements and explanations made by the State's attorney during the examination of witnesses and in his argument to the jury, need not be supported by argument. While great liberty is permitted counsel in the argument to the jury of facts in evidence by the testimony, it is improper in any case, and especially in one involving life and liberty, to assume or state as facts matters not in evidence and base an argument thereon. *Fox* v. *People,* 95 Ill. 71; *Brown* v. *Swineford,* 44 Wis. 282.

The verdict of the second coroner's jury, which held plaintiff in error and his wife responsible for the death of Mary Hetrick by administering to her strychnine with intent to kill and murder the said Mary Hetrick and recommending that they be held to answer to the grand jury without bond, was read to the jury by the State's attorney in his closing argument. After reading it he said: "The indictment shows that Mrs. McMahon was a witness before the grand jury. They have read it to you." Objec-

tion by counsel for plaintiff in error to this statement was sustained, and thereupon the State's attorney said: "They read the indictment, and among the details is that Mrs. Mc-Mahon was a witness before the grand jury. You know what the verdict of the coroner's jury is now. You can draw your own conclusions." Objections to these remarks were overruled and exceptions taken. Whatever may have been the purpose or intention of the State's attorney, the effect of this was to inform the jury that the grand jury, after having had Mrs. McMahon before them, did not indict her. The necessary inference would be that her story exonerated her and placed the blame where it belonged. This may not have been the purpose of the State's attorney, but it was the effect of what he said and was highly prejudicial to the plaintiff in error. We think it sufficient, alone, to reverse the judgment in this case.

Alice Oakey, a witness who had testified for the prosecution, was placed on the stand by the plaintiff in error to prove when a certain trip to Princeton was made by the deceased in company with the wife of the plaintiff in error. Previous to going on the witness stand she had told counsel for plaintiff in error that her recollection was the trip was made in the fall of the year, but she testified it was made in the spring. She was called out of the State's attorney's office in the court house by counsel for plaintiff in error for the purpose of talking with her about her recollection as to when the trip referred to was made, and after he had talked to her, and before placing her on the stand, she returned to the State's attorney's office. She admitted telling counsel for plaintiff in error that her recollection when she talked to him was that the trip was made in the fall of the year. On cross-examination she was asked by counsel for the prosecution if she had refreshed her memory, after talking with plaintiff in error's counsel, by talking with anybody, and replied that she had; that she had talked with somebody in the State's attorney's office in the

court house. She was then asked whom she had talked to. This was objected to, and counsel for the prosecution stated that the witness had inquired of. Mrs. McMahon and she had told her. Counsel for plaintiff in error objected to the remarks of counsel and asked a ruling of the court as to their propriety. The court remarked that if they were made in good faith he did not see any particular impropriety in them. Counsel for plaintiff in error persisted in his objections and again urged a ruling of the court. The court remarked that he knew nothing more to say than he had already said. We regard this as serious prejudicial error. Whether so intended or not, it was calculated to produce on the minds of the jury the impression that the prosecution had the aid and assistance of the wife of plaintiff in error, and that she was then, during the progress of the trial, so engaged in the State's attorney's office. Such an impression was almost as inevitable a result as if counsel had so stated in express words, and that this would have been highly erroneous cannot be disputed.

It is also urged by plaintiff in error that proof by Whiting and Dr. Landis of what the wife of plaintiff in error said in explaining to them how her attention was first attracted to there being something the matter with Mary Hetrick and her condition when she went into the kitchen and discovered her lying on the floor, was erroneous and should not have been admitted. We have above set out the substance of this testimony, and it will be seen there was nothing in it that in any way tended to criminate or prejudice plaintiff in error. He was in nowise connected by his wife with anything she said to Whiting or the doctor. Proof of these statements of the wife did not prejudice plaintiff in error and was not erroneous. Neither do we think it was erroneous to admit the proof that Mary Hetrick was pregnant, and competent proof of circumstances, if there were such, that tended to show plaintiff in error was, or might have been, the father of her unborn

child. This was the theory of the prosecution and it was contended furnished the motive for the crime. The sufficiency of the evidence to prove the fact alleged was for the jury.

It is also urged the court erred in not granting a new trial on account of the subsequently discovered misconduct and prejudice of one of the jurors. The record shows that Leroy Plumley was one of the jurors before whom the case was tried; that on his examination by counsel for the People touching his competency as a juror he stated he had read about the case and that he might have talked about it. The following questions were then asked of him and he made the following answers:

Q. "Did you hear anybody express their opinion as to the guilt or innocence of the defendant?

A. "I could not say as I did, exactly.

Q. "Did you form any opinion yourself?

A. "Not exactly.

Q. "Have you expressed any opinion as to the guilt or innocence of the defendant?

A. "No, sir."

One of the grounds of the motion for a new trial was that this juror was prejudiced and made false answers to questions as to his competency before he was accepted. In support of this ground plaintiff in error produced and read, on the argument of the motion for a new trial, the affidavit of Leonard Jontz, in which the affiant swore he was well acquainted with the juror Leroy Plumley; that he (affiant) lived on a farm in Bureau county and that Plumley worked for him on the farm from March 8, 1909, until he was summoned as a juror in said cause; that prior to being summoned as a juror, Plumley and affiant read the newspaper accounts in the *Bureau County Republican* relating to the alleged crime and frequently discussed them; that in these conversations the question of plaintiff in error's guilt was discussed, and Plumley stated to affiant,

shortly before being summoned as a juror, that if the newspaper reports were true he believed plaintiff in error was guilty of the murder. Also the affidavit of Wilson W. Stroud, who swore he was well acquainted with the juror Plumley; that affiant heard and took part in a conversation relating to the trial and conviction of plaintiff in error at a certain store in the village of Manlius on Saturday, June 26, 1909, which was a few days after the verdict finding plaintiff in error guilty had been returned into court by the jury and the jury discharged; that in said conversation Leonard Jontz said to Plumley, "You had your mind made up all the time before you went there," and Plumley replied, "Yes, I have always said he ought to be hung;" that affiant then asked Plumley why they took him on the jury, and Plumley replied that he was not asked whether he had any opinion as to the guilt or innocence of plaintiff in error; that all the jurors except himself had been asked about that. No denial of these affidavits was made by the juror nor were counter-affidavits from any source procured by the prosecution. Counsel for plaintiff in error say in their brief that they had present in court, when they read the affidavits of Jontz and Stroud, the affiants themselves, and informed the court and opposite counsel that they were there for the purpose of undergoing any further examination upon the subject sworn to in their affidavits that the court or counsel might desire to make and that none was made. This does not appear from the record but its truth is not questioned by counsel for defendant in error in their brief. From these affidavits it would appear that the juror was not a fair juror but that he was prejudiced against plaintiff in error at the time he was accepted as a juror, and that he made untruthful answers to questions asked him before his acceptance for the purpose of determining whether he was fair and unprejudiced. We are referred to no case where an undisputed showing, such as is made here, was held to be insufficient

244—5

to entitle a defendant to a new trial. Numerous cases will be found in our Reports where affidavits of the character here made were contradicted by the affidavits of the jurors and others and they were held not sufficient to entitle the party to a new trial, but in all of them the rule was stated to be, that to entitle a party to a new trial on such grounds the proof should be of a clear and satisfactory character, otherwise a verdict warranted by the evidence was not required to be set aside. If there could be a case presented where affidavits of the prejudice of a juror could be said to be clear and satisfactory, this is such a case. The affidavits presented, not being in any way contradicted, clearly show the juror to have been prejudiced when accepted, and that he not only concealed this fact but made untruthful statements in doing so. Whatever may be the crime charged, the law guarantees to the defendant a trial by a jury composed of fair-minded and unprejudiced men, and this right of the defendant cannot be disregarded. If there were no other error in this record we are of opinion the conduct of the juror Plumley would require a reversal of this judgment.

In the brief and argument of plaintiff in error much complaint is made of disorder in the court room and demonstrations on the part of the audience, by cheering or hand-clapping, during the progress of the trial. Some of these demonstrations occurred over remarks of a witty or sarcastic nature made by counsel, but one cannot read this record without being impressed that the audience was unfriendly to plaintiff in error and some of the demonstrations occurred apparently because of such feeling. Counsel for the plaintiff in error, during the introduction of the testimony for the prosecution, called the court's attention to "the demonstrations that are being made in the court room by cheering and clapping of hands." The court remarked that he would try to guard against demonstrations the best he could. They appear to have been repeated, and

the court more than once admonished and warned the audience that such demonstrations must not occur. They did occur again until the court stated that if there was another demonstration he would exclude every one from the court room during the further progress of the trial, and instructed the sheriff, if another demonstration occurred, to clear the room. While this complaint of the plaintiff in error may not be vital to the decision of this case, we feel that it should receive mention in this opinion. The trial was a public hearing, and people desiring to do so had the right to attend it as spectators if they conducted themselves in an orderly manner, but spectators attending a trial of any character, whether civil or criminal, should not be permitted to manifest their prejudice or partisanship or give expression to their pleasure at anything that occurs by cheering and clapping hands. If it does unthoughtedly occur once, its repetition should be prohibited and the necessary means resorted to by the court to preserve order and decorum.

We have not referred to a number of complaints made by plaintiff in error of occurrences during the progress of the trial which, it is contended, were prejudicial to him. Some of the alleged errors not referred to might justify criticism, but they are not of so serious a character, we think, as to require their discussion in this opinion. Some of the errors to which we have referred, standing alone, would perhaps be insufficient to justify a reversal if the record were otherwise free from fault. They justify the conclusion that the plaintiff in error was in some measure prejudiced by them and to that extent was not accorded the rights he was entitled to under the law. When those errors are considered with the others of a more serious character referred to, we cannot escape the conviction that it is our duty to reverse the judgment in this case, and it is accordingly done and the cause remanded.

*Reversed and remanded.*