(No. 76329.

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lee, v. WILLIAM CLAIR KEENE, Appellant.

*Opinion filed November 2, 1995.—Rehearing denied
January 29, 1996.*

NICKELS, J., joined by HARRISON, J., concurring.

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Michael P. Bald, State's Attorney, of Freeport (Barbara A. Preiner, Solicitor General, and Arleen C. Anderson and Martha E. Gillis, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

A Stephenson County jury convicted William Keene

of armed robbery and murder and sentenced him to death. In this direct appeal (720 ILCS 5/9—1(i) (West 1992); 134 Ill. 2d R. 606), we affirm the convictions and sentence.

## BACKGROUND

Evidence showed that Keene and two others, Larry Ehlers and Michael Hoover, planned to rob Bob Peters' gun shop in Freeport, Illinois. On November 11, 1992, the three left Andrea Krueger's home in Tinley Park, Illinois, travelling to Freeport in a rented vehicle. They spent the night in a motel room which Ehlers had registered for under an alias.

Early the next morning, Keene, Ehlers, and Hoover drove to the gun shop. Biding their time until Peters was alone, the three entered. Ehlers was armed with a handgun. To distract Peters, Hoover asked to see one of the knives for sale. Ehlers then shot Peters in the chest. Peters did not immediately fall, and Ehlers shot him again in the head. Peters collapsed between the sales counter and a cabinet behind it. While Peters was on the floor, incapacitated but still alive, his throat was slit.

After collecting guns, knives, and money from Peters' wallet, Keene, Ehlers, and Hoover drove back to Tinley Park.

The jury determined Keene to be eligible for death, finding that he had slit Peters' throat. The primary evidence of that was supplied by Hoover, who had agreed to testify against Ehlers and Keene in a plea bargain with the State. Hoover told the jury that, during the drive back to Tinley Park, the three had recounted what had happened in the gun shop. Hoover said that Keene admitted to having slit Peters' throat, though Hoover admitted that he had not actually seen Keene do so. Hoover said, however, that he had seen Keene behind the counter where Peters collapsed.

Other evidence corroborated Hoover's testimony. Keene had admitted to police that he was left-handed. Hoover and Ehlers were right-handed. Larry Blum, a pathologist, believed that whoever had slit Peters' throat had likely held the knife in his left hand. Blum based his opinion on how the cut looked to have been formed and the position of Peters' body.

Against those general facts, Keene raises several challenges to his convictions and sentence. Greater detail regarding the issues is set out in the discussion of them below.

## DISCUSSION

### Denial of Funds for a Defense Pathologist

The defense sought the appointment of an expert in pathology, intending to counter the evidence that a left-handed person had slit Peters' throat. Funds were allowed for a private investigator, but not a pathologist. Refusal of such funds, Keene argues, violated due process and equal protection guarantees, undermined the credibility of the sentencing determination and deprived him of effective assistance of counsel. Ill. Const. 1970, art. I, § 8; U.S. Const., amends. VI, VIII, XIV.

In *People v. Lawson* (1994), 163 Ill. 2d 187, we touched on the constitutional protections relevant to indigents' requests to secure experts. As a matter of Illinois constitutional jurisprudence, the protections are triggered when the expertise sought goes "to the 'heart of the defense.' " (*Lawson*, 163 Ill. 2d at 220-22, quoting *People v. Watson* (1966), 36 Ill. 2d 228, 234.) Of course, whether the expertise sought is of that nature will vary with the circumstances of each case. (*Watson*, 36 Ill. 2d at 234.) The touchstone, however, is not with what is useful, helpful, valuable, or even important to the defense effort but what is "crucial" to it. (*People v. Glover* (1971), 49 Ill. 2d 78, 82-83 (acknowledging that

prejudice is necessarily present when an issue is "crucial" to the defense).) A similar concern lies at the core of the last of the elements that the Supreme Court has identified as relevant to providing indigents "raw materials" for building a defense. *Ake v. Oklahoma* (1985), 470 U.S. 68, 77-82, 84 L. Ed. 2d 53, 62-65, 105 S. Ct. 1087, 1093-96.

What is crucial to the defense effort is often made plain in taking account of the inculpatory evidence offered. (*Cf. Ake v. Oklahoma*, 470 U.S. at 82-83, 84 L. Ed. 2d at 65-66, 105 S. Ct. at 1095-96 (holding that where a defendant's sanity at the time of the offense is to be a significant factor at trial, the defendant is entitled to funds for an expert in psychiatry).) Thus, in *Lawson*, where the State's "strongest piece of evidence" was shoeprints, the defendant was entitled to have an expert examine them. (*Lawson*, 163 Ill. 2d at 228-29.) And, in *Watson*, where prosecution for delivery of a forged traveler's check turned on the instrument's counter signature, the defendant was entitled to a handwriting expert. (*Watson*, 36 Ill. 2d at 234.) But, in *Bell*, no need was shown for a medical expert to prove the defendant's drug dependency, addiction being irrelevant to the charge of narcotics possession there. *People v. Bell* (1972), 53 Ill. 2d 122, 129-30.

An expert opinion that Peters' throat was not slit by someone using his left hand could have helped rebut the evidence that Keene, the sole left-handed perpetrator, was responsible. But the State's case against Keene did not turn on proof that the act could only have been done by a left-handed person. That belies the notion that a pathologist's participation was crucial to the defense.

Blum's testimony was only that it was likely that whoever had slit Peters' throat had done so holding the knife in the left hand. The cut, Blum believed, was formed by the knife passing from the right side of

Peters' throat to the left. Making such a cut would have been awkward for a person holding the knife in his right hand given where Peters lay on the floor. But Blum never excluded the possibility that the actor could have held the knife in the right hand. He simply believed it unlikely. Nor, it should be noted, did Blum's testimony do anything to dispel the idea that a right-handed person, using the weaker hand, might have inflicted the wound.

More importantly, the primary evidence against Keene was not Blum's opinion as to how Peters' throat had been slit. The core of the State's case was Hoover's testimony that Keene had admitted complicity. A defense pathologist may have rendered an opinion contrary to Blum's. But such could only indirectly refute what Hoover recounted of Keene's responsibility for slitting Peters' throat. Thus, the issue of how Peters' throat was slit was not, in that way, crucial to Keene's defense. We therefore find no error in the decision not to make funds available to Keene to retain a pathologist.

### Failure to Excuse Venireperson

Having used all of its allotted peremptory challenges, the defense unsuccessfully sought to excuse for cause from the venire Delbert Folgate. Folgate, it is asserted, was predetermined to "automatically" vote for death and therefore should not have served as a juror.

As the point was not set out in Keene's post-trial motion, the State urges that we ignore it. The State argues that "plain error," which it says is the means to reach the issue's merits, is not satisfied by the circumstances of the case.

Generally, the filing of a post-trial motion is necessary to preserve issues for appellate review. The requirement is a statutory one (see 725 ILCS 5/116—1 (West 1992)), different from the additional, initial need for a timely trial objection. (See *People v. Enoch* (1988), 122

Ill. 2d 176, 187.) Where a post-trial motion has been filed, the statutory requirement is interpreted to also mandate inclusion of the particular points sought to be raised on appeal. See, *e.g.*, *People v. Thomas* (1984), 121 Ill. App. 3d 883, 891.

In capital cases, however, procedural defaults are excused for three categories of error: errors for which a timely trial objection was made and which could be asserted in a post-conviction petition (725 ILCS 5/122—1 (West 1992) (permitting only claims of "substantial denial of *** rights under the Constitution of the United States or of the State of Illinois")), challenges to the sufficiency of the evidence, and "plain" errors. (*People v. Enoch* (1988), 122 Ill. 2d 176, 190.) The categories are mutually exclusive. See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 103.10, at 33 (6th ed. 1994) (noting that both "plain" and "reversible" error exist only with regard to a "substantial right" but that, if that term had the same meaning for both types of error, the requirement of a timely trial objection would be rendered inconsequential).

Plain error is not the reason for which the merits of Keene's argument may be considered. The purported error—participation of a juror who would vote indiscriminately to impose death—is assailable as a fourteenth-amendment-based due process claim. (See *Morgan v. Illinois* (1992), 504 U.S. 719, 728-29, 119 L. Ed. 2d 492, 502-03, 112 S. Ct. 2222, 2229-30.) The Post-Conviction Hearing Act accommodates such a claim. Further, there had been a contemporaneous trial objection made to Folgate's jury participation. Keene's claim here therefore need not rise to the level of plain error to excuse the procedural bar.

The contention, however, fails substantively. Folgate did initially say during *voir dire* that he was "for" the death penalty and would vote to impose it if Keene

should be found guilty. But Folgate's answers to later questions show that he simply misunderstood, at first, the sentencing options. Folgate had thought that Keene was to be put to death if found guilty on one or all of the pending charges. Folgate was confused by questions indicating that he did not have to vote for death and said so. The trial judge then explained that the imposition of death was not automatic given a finding of guilt. He also explained the difference between a finding of death eligibility in the first stage of the sentencing considerations and the imposition of that penalty in the second stage. Folgate then indicated that he would not vote for death if he believed, in the end, that the ultimate penalty was inappropriate.

The record does not, therefore, reveal what is essential to Keene's claim: Folgate's promise to vote for death regardless of mitigating circumstances. There was no error in the refusal to dismiss Folgate for cause.

Exclusion from *Voir Dire* Examination

As part of his plea bargain, Hoover accepted a 40-year prison sentence on one count of murder. He also agreed to serve a concurrent 15-year sentence for armed robbery. But prior to testifying at trial, Hoover moved to withdraw his plea. He felt that the sentence he had agreed to was too harsh. Correspondence also indicated that Hoover feared harm in jail if he testified for the State. The State believed Hoover's cooperation was in jeopardy. It sought, and was allowed, to question Hoover outside of the jury's presence to see if he would testify as he had promised.

The trial judge excluded Keene from the courtroom during Hoover's *voir dire*. Although defense counsel was present, Keene contends that his exclusion violated his right to confront witnesses and his right to due process under the sixth and fourteenth amendments (U.S. Const., amends. VI, XIV). He also claims his sixth

amendment right to effective assistance of counsel was violated. U.S. Const., amend. VI.

The measure for assessing whether Keene's exclusion violated due process and confrontation clause guarantees is *Kentucky v. Stincer* (1987), 482 U.S. 730, 96 L. Ed. 2d 631, 107 S. Ct. 2658. There, the Supreme Court considered the exclusion of the defendant from a hearing to determine the competency of two child witnesses to testify against him. The Supreme Court held that the exclusion did not violate either the sixth amendment or the fourteenth amendment.

As for the right of confrontation, the Court reasoned that the exclusion did not compromise the defendant's opportunity at trial to cross-examine the witnesses. (*Kentucky v. Stincer*, 482 U.S. at 740, 96 L. Ed. 2d at 644, 107 S. Ct. at 2664-65.) The children had been subjected to both direct and cross-examination at the competency hearing. The questions asked could easily have been repeated at trial. *Kentucky v. Stincer*, 482 U.S. at 740, 96 L. Ed. 2d at 644, 107 S. Ct. at 2664-65.

Here, as in *Stincer*, defense counsel was present during Hoover's *voir dire*. This case differs in that the questioning of Hoover did not include cross-examination. But under the Supreme Court's confrontation clause analysis, the distinction is one of no material difference. The reason: it is the opportunity to cross-examine witnesses at trial, not earlier, that is determinative. So long as there is no interference with the usual opportunity for cross-examination at trial, no sixth amendment violation arises.

Opportunity to cross-examine Hoover at trial was in no way interfered with by excluding Keene from the *voir dire*. Hoover appeared and testified in open court during Keene's trial. (See *Stincer*, 482 U.S. at 740, 96 L. Ed. 2d at 644, 107 S. Ct. at 2664-65.) Defense counsel could have repeated any question heard earlier. (See

*Stincer*, 482 U.S. at 741, 96 L. Ed. 2d at 644, 107 S. Ct. at 2665.) Though such opportunity is not assured in every case, cross-examination being generally limited to matters raised on direct, there was no impediment to repeating the questions here. There was no violation of Keene's sixth amendment confrontation clause right.

As for due process, the Court's analysis in *Stincer* turned on the nature of the hearing from which the defendant had been excluded. The Court noted that the competency hearing was a limited one which did not reach the substance of the child witnesses' trial testimony. (*Stincer*, 482 U.S. at 745-46, 96 L. Ed. 2d at 647-48, 107 S. Ct. at 2667-68.) The respondent had presented no evidence to show that his presence would aid in the competency determination. (*Stincer*, 482 U.S. at 747, 96 L. Ed. 2d at 648, 107 S. Ct. at 2668.) However, the Court noted in *dictum* that a different type of hearing—one "in which a witness is asked to discuss upcoming substantive testimony"—might bear a "substantial relationship" to the defense effort at trial. (*Stincer*, 482 U.S. at 746, 96 L. Ed. 2d at 648, 107 S. Ct. at 2667.) If so, a defendant's exclusion from the earlier hearing might amount to a due process violation.

Here, the questioning of Hoover did touch upon his upcoming substantive trial testimony in addition to whether he would comply with the plea agreement. The State asked Hoover about his arrest and inquired as to when he had met Keene and Ehlers. Other questioning permitted the State to read into the record a written recitation of the facts to which Hoover had agreed to testify. The recitation included a summary of a tape-recorded statement Hoover had given to police upon his arrest. The taped statement was played. The same factual recitation, including the taped statement's contents, had been stipulated to earlier by Hoover and had been read at the announcement of Hoover's guilty plea.

14

The question is whether the substantive points elicited during the *voir dire* bore a "substantial relationship" to Keene's trial defense. (See *Cates v. Cates* (1993), 156 Ill. 2d 76, 80 (explaining that an expression in *dictum* of an opinion on a point argued by counsel and decided by a court, though not essential to the case at hand, should be followed where not erroneous).) Keene had certain personal knowledge of the events. Arguably, such knowledge would have put Keene in a position, had he been present for the *voir dire*, to assist defense counsel in evaluating Hoover's answers. Later at trial, Keene would have been in a position to point out inconsistencies in Hoover's testimony based on the earlier answers he, Keene, had observed. In that respect, Keene's "privilege of presence" would not be "useless, or the benefit but a shadow." *Snyder v. Massachusetts* (1934), 291 U.S. 97, 106-07, 78 L. Ed. 674, 678, 54 S. Ct. 330, 332.

But, in fact, Keene's exclusion from the *voir dire* could not have hampered—or, to mirror the Court's concern, Keene's presence could not have advanced (see *Stincer*, 482 U.S. at 747, 96 L. Ed. 2d at 648, 107 S. Ct. at 2668)—the defense. A court reporter transcribed the *voir dire*. Hoover's answers were a part of the trial record. What Hoover had said was available for Keene to review before Hoover took the stand. Keene therefore enjoyed the opportunity to assist defense counsel in revealing falsehoods or pointing out inconsistencies in Hoover's trial testimony. Moreover, the substantive evidence of note touched on during the *voir dire*—that regarding the events of the morning of November 12, 1992—had been previously disclosed in open court when Hoover pled guilty.[1] No new substantive evidence was reached.

---

[1]The record contains a discovery motion in which the defense requested the inspection of statements of codefendants and

Keene has presented no other grounds to establish a "substantial relationship" between the answers Hoover gave during *voir dire* and Keene's trial defense. Because Keene's ability to defend himself at trial was not in any way materially affected by his exclusion during Hoover's *voir dire*, there was no due process violation.

Finally, there is the contention that Keene's exclusion violated his right to effective assistance of counsel. Keene takes no issue with what counsel actually did or did not do regarding Hoover's questioning. Rather, Keene argues that because he could not confer with counsel during the *voir dire*, the representation necessarily suffered.

But, again, Keene's presence was, in reality, of no real consequence in view of the evidence touched upon. Defense counsel simply did not need what Keene's presence could provide: Keene's personal input. Keene suffered no prejudice sufficient to support an ineffectiveness-of-counsel claim. See *Strickland v. Washington* (1984), 466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069 (stating that lack of prejudice is sufficient to resolve ineffectiveness claims, the performance of counsel being irrelevant in the absence of harm).

### Admission of Prior Consistent Statements

Audrey Krueger was Larry Ehlers' girlfriend. Krueger had helped Ehlers rent the vehicle used in the crimes. Keene, Hoover, and Ehlers had gathered at Krueger's home before leaving for Freeport. The three had returned to Krueger's home after the robbery and murder. Krueger, however, was not charged in the crimes, and she testified against Keene as a State witness.

---

intended prosecution witnesses. No argument is made, nor is there otherwise any indication, that Keene was not able to inspect Hoover's statements underlying his guilty plea.

During cross-examination, Krueger admitted that, when questioned by police officers investigating the crimes, she had lied about several matters. The matters related, primarily, to the lease of the vehicle, whether she viewed the stolen weapons at her home, and whether there had been an inventory of them. During redirect examination, the State focused on statements Krueger had given to police which were consistent with what she had testified to during direct examination.

The use of the prior consistent statements, Keene asserts, improperly bolstered Krueger's credibility. Keene notes the absence here of circumstances such as would justify the use of such statements. See *People v. Powell* (1973), 53 Ill. 2d 465, 474-75.

The State contends, and we agree, that no basis exists to reach the merits of the issue. Keene's post-trial motion did not contest the substance of Krueger's redirect examination. None of the exceptions which would allow for taking notice of the claim given the procedural default apply. The claim is not based on the sufficiency of the evidence. (See *Enoch*, 122 Ill. 2d at 190.) Nor is the claim based on a constitutional right capable of being raised in a post-conviction petition. (See *People v. Cox* (1966), 34 Ill. 2d 66, 68 (stating that the erroneous admission of evidence "does not constitute a denial of constitutional rights[ ] or present a question which will justify a post-conviction hearing").) That is so notwithstanding that, in not objecting at trial to portions of the redirect examination, the argument based on those questions was doomed independently. See *Enoch*, 122 Ill. 2d at 190.

The final basis for excusing the procedural default, plain error, lies within our Rule 615(a). The rule states that notice may be taken of "[a]ny error, defect, irregularity, or variance" which affects "substantial rights" though such was not "brought to the attention

of the trial court." (134 Ill. 2d R. 615(a); see also *People v. Pickett* (1973), 54 Ill. 2d 280, 282 (noting that the rule does not mandate review of all errors affecting substantial rights).) Plain error exists only with respect to "fundamental fairness": a procedural default will not preclude review of an issue involving "substantial rights" if to honor the bar would work "fundamental [un]fairness." (See *People v. Hamby* (1965), 32 Ill. 2d 291, 294.) Plain error marked by "fundamental [un]fairness" occurs only in situations which "reveal breakdowns in the adversary system," as distinguished from "typical trial mistakes." (See Wangerin, *"Plain Error" and "Fundamental Fairness": Toward a Definition of Exceptions to the Rules of Procedural Default*, 29 DePaul L. Rev. 753, 778 (1980) (hereinafter Wangerin, 29 DePaul L. Rev. 753).) Put differently, what must be affected by the asserted error must be something "fundamental to the integrity of the judicial process." (See *People v. Green* (1979), 74 Ill. 2d 444, 456 (Ryan, J., specially concurring).) Essentially, the fairness of the trial must be undermined.

Finally, though it is often not expressed, short of a conclusion that an asserted error is a "plain" one, the so-called plain error doctrine offers no basis to excuse a procedural default. (See Wangerin, 29 DePaul L. Rev. at 772.) The point is crucial, for while all plain errors are reversible ones, not all reversible errors are also "plain" for purposes of Rule 615(a). (See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 103.10, at 33 (6th ed. 1994).) Of course, to determine whether a purported error is "plain" requires a substantive look at it. But if, in the end, the error is found not to rise to the level of a plain error as contemplated by Rule 615(a), the procedural default must be honored.

Rule 615(a) provides that if "substantial rights" are not affected, any such claim "shall be disregarded." (134

Ill. 2d R. 615(a).) That language, this court has observed, mandates that "[b]efore plain error can be considered as a means of circumventing the general waiver rule, it must be plainly apparent from the record that an error affecting substantial rights was committed." (*People v. Precup* (1978), 73 Ill. 2d 7, 17.) But the threshold concern is just as often as not whether the evidence presented was "closely balanced." The reason: the strength or weakness of inculpatory evidence has long been seen as relevant to ignoring procedural defaults in remedying occasioned injustice. See *Green*, 74 Ill. 2d at 454 (Ryan, J., specially concurring).

As a result, a disjunctive approach has evolved for determining the existence of plain error. A procedural default may be excused either because the error affected "substantial rights" or, independent of the nature of the right affected, simply because the evidence in the case was closely balanced. (See, *e.g.*, *People v. Speight* (1992), 153 Ill. 2d 365, 379.) The disjunctive approach is not without its critics. (See Wangerin, 29 DePaul L. Rev. at 786-87.) The better approach, it is suggested, is a conjunctive one, similar to the "cause and prejudice" test used in Federal *habeas corpus* cases. (See Wangerin, 29 DePaul L. Rev. at 786-87.) The nature of the right affected and the strength or weakness of the evidence would be co-factors in the determination of plain error. (See Wangerin, 29 DePaul L. Rev. at 786-87.) Nevertheless, absent a foundation for assessing directly the merits and shortcomings of the disjunctive approach, its dual considerations must apply here.

Assuming that prior consistent statements in fact were used improperly to bolster Krueger's credibility—a point the State by no means concedes—the claim does not implicate a substantial right. (See *Cox*, 34 Ill. 2d at 68; *cf. People v. Thurman* (1984), 104 Ill. 2d 326, 329 (holding that the adequacy of jury instructions affects

"substantial rights"); *People v. Graves* (1974), 23 Ill. App. 3d 762, 766 (holding that application of an unconstitutional statute affects "substantial rights").) Nor was the evidence presented against Keene closely balanced. In fact, there was virtually no evidence countering, directly, Hoover's testimony that Keene participated in the robbery and that Keene had slit Peters' throat.

We therefore dismiss, without reaching the merits, the claim of error with regard to the redirect examination of Krueger.

Hoover's Statement Regarding Keene's Imprisonment

Keene had been released from incarceration in Wisconsin shortly before taking part in the crimes underlying this case. Pursuant to a defense motion *in limine*, the trial judge barred reference to that fact at trial. Nevertheless, Hoover alluded to Keene's release from prison during his cross-examination. Keene sought a mistrial. The trial judge denied the request. The jury was instructed to disregard Hoover's statement, as Hoover's answer had not been responsive to the question asked.

Keene claims it was error not to declare a mistrial. The State, he says, should have "more effectively instructed" Hoover not to mention Keene's prior imprisonment. Regardless, Keene states, Hoover's statement was sufficiently prejudicial to violate the due process clause. U.S. Const., amend. XIV.

Such claims of error as Keene raises have been resolved with reference to how the particular testimony challenged came about. Where a challenged statement has not been made in direct response to a question, that fact has been seen to be consequential. (See *People v. Naujokas* (1962), 25 Ill. 2d 32, 35-36.) Where the statement arose from vigorous defense cross-examination, that fact has been taken into account. (See *Naujokas*, 25 Ill. 2d at 35-36.) Of course, neither circumstance would

operate to negate resulting prejudice, a central concern to the claim Keene raises. On the other hand, prompt action taken with regard to the particular testimony may have some hope of blunting actual harm. And so where the jury is immediately admonished to disregard the statement, that action is material to the analysis (see *People v. Naujokas* (1962), 25 Ill. 2d 32, 35-36) even though, it is said, it is impossible to unring a bell (see *People v. Brown* (1975), 27 Ill. App. 3d 891, 898, quoting *Maness v. Meyers* (1975), 419 U.S. 449, 460, 42 L. Ed. 2d 574, 584, 95 S. Ct. 584, 592).

The record here tells nothing about the State's efforts in instructing Hoover as to the scope of permissible testimony. The fact that the statement was made simply does not permit the conclusion that the State was to blame for it. (See generally *People v. Gregory* (1961), 22 Ill. 2d 601, 604.) Keene's assertion is pure speculation, and the implication of a *per se* due process violation based upon it a chimera. For that matter, the record does not show that Hoover's statement resulted from vigorous cross-examination or even, more darkly, prompted error. As such, principles of waiver cannot help to resolve the issue.

The concern, then, is whether prejudice resulted. The trial judge here did what he could to reduce the impact that the reference to Keene's prior incarceration could have on the jury's collective mind. It is at least arguable that the admonishment could not eliminate all chance of prejudice. But we do not believe that what residual harm may have remained could rise to the level of a due process violation.

### Jury Commentary

Keene, who declined to testify at trial, contends that the State impermissibly remarked on that fact during its rebuttal argument to the jury. The State had noted that certain evidence it presented, essentially Hoover's

testimony, was uncontradicted. The problem, Keene asserts, is that the substance of Hoover's testimony pertained only to matters Keene, himself, could have countered. Thus, Keene argues, the State was impliedly referring to Keene's having invoked his fifth amendment right not to testify. U.S. Const., amend. V; see also *People v. Howard* (1991), 147 Ill. 2d 103, 146-47.

Keene concedes that it is generally permissible for the State to point out in closing argument that evidence is uncontradicted. (See *People v. Bryant* (1983), 94 Ill. 2d 514, 524.) What is not conceded—and what the issue turns on—is the extent to which the reference is appropriate in the context of the trial. (See *Howard*, 147 Ill. 2d at 147, citing *United States v. Robinson* (1988), 485 U.S. 25, 31-32, 99 L. Ed. 2d 23, 31, 108 S. Ct. 864, 868-69.) The State may not "point the finger of blame directly at the defendant for his failure to testify when it was within his power to enlighten the jury." (*People v. Mills* (1968), 40 Ill. 2d 4, 9.) Such "prosecutorial design" crosses the " 'danger line' " marking the outer boundary of proper commentary. (See *Mills*, 40 Ill. 2d at 9, quoting *People v. McMahon* (1910), 244 Ill. 45, 59.) But short of that the State may comment that evidence is uncontradicted and may do so even if the defendant was the only person who could have provided contrary proof. (*Mills*, 40 Ill. 2d at 8.) To put it differently, the State is free to point out what evidence was uncontradicted so long as it expresses no thought about who specifically—meaning the defendant—could have done the contradicting. See, *e.g.*, *People v. Wollenberg* (1967), 37 Ill. 2d 480, 487-88 (involving the comment, "[n]o one else testified").

The State here insists that the commentary was proper simply because such proof could have been supplied by either of the "two accomplices." Those would have been Hoover and Ehlers. Given that the State built its case on bargained-for testimony from Hoover, the no-

tion that he could have also provided contrary proof is too clever by half: If Hoover could have testified to a different scenario, what evidence would there have been to contradict? That Ehlers could have supplied contrary proof is nearly as forthright: it is doubtless that Ehlers would have exercised his own fifth amendment right not to testify.

It is certainly the case that Audrey Krueger could have testified that Keene did not intend to take part in the robbery. She could also have provided proof that Keene was unaware that murder was a part of the plan. Marion Janssen, another witness, could also have provided contradictory evidence. Janssen said that she saw Keene, Hoover, and Ehlers walking in the vicinity of the gun shop shortly before the crimes occurred. If Keene had not been with Hoover and Ehlers in Freeport on that day, Janssen could have directly disputed proof of Keene's participation.

The fact that Krueger and Janssen existed as witnesses is relevant in evaluating the State's comments within the context of the trial. (See *Mills*, 40 Ill. 2d at 9-10.) It is of no consequence that Krueger and Janssen testified for the State. What is important is that they had been present at events pertaining to the crimes for which Keene was charged. That allows for a consideration of what they might have testified to were it different from what they did, in fact, relate.

Even so, the fact that a witness besides a defendant could have provided contrary proof does not end the analysis: impermissible commentary on the defendant's failure to testify may nevertheless be expressed.

But that is not the case here. The commentary about the evidence being uncontradicted shows no such "prosecutorial design." The State kept its remarks to the "what" of the evidence uncontradicted—how the crimes "went down" including testimony that Keene had slit

Peters' throat—and did not stray into the "who" of the issue. For that reason, as well as the fact that other witnesses existed showing the commentary to be appropriate within the context of the trial, Keene's argument must fail.

Keene also cites as error several other remarks made by the State during rebuttal argument. However, Keene's post-trial motion preserved for review only the comments about uncontradicted evidence. No objection accompanied any of the other comments and the argument is not based on insufficient evidence. The issue may be reviewed only to the extent permitted as a matter of plain error. For reasons explained previously, the case against Keene was not closely balanced. That leaves the existence of an affected substantial right as the only ground for reaching the claim's merits.

Improper jury summations can implicate substantial rights. (See Wangerin, 29 DePaul L. Rev. at 774 n.108.) If the commentary has the effect of undermining the entire trial, plain error exists and reversal for a new trial is warranted. (See, *e.g.*, *People v. Fort* (1958), 14 Ill. 2d 491, 502 (involving comments that defendant was a habitual criminal).) If it does not, the commentary amounts to harmless error (see *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824), in which case, as pointed out earlier, the procedural default may not be excused. The inquiry is a difficult one, for the record rarely reveals objective grounds for assessing harm.

Four different types of unpreserved comments are cited. The first pertained to Hoover's improper statement about Keene's incarceration in Wisconsin. The State mused that Keene was unable to aid in planning the crimes until he "came down" to "get together" with Hoover and Ehlers. In a comment Keene says is related, the State suggested that the crimes were done "pretty

professionally." The implication, Keene argues, is that Hoover sought to include Keene in the crimes because, as evidenced by the prior incarceration, Keene was a career criminal.

Pointing out Keene's inability to help plan the crimes until he arrived in Illinois was proper commentary rooted in evidence. It is a fact that Keene came to Illinois, joining Hoover and Ehlers at Audrey Krueger's house in Tinley Park. That fact was elicited by the defense after the jury was told to disregard what Hoover said about Keene's release from prison. To that extent, there is no basis to conclude that the State was attempting to remind the jury about the impermissible evidence it had heard about Keene's prior incarceration. Commenting about the "professional" nature of the crimes was also grounded in evidence. The crimes were planned in advance and were accomplished with, for lack of a more appropriate expression, a degree of efficiency.

The comment as to why Hoover asked Keene to join in the crimes is not so directly connected to evidence, and so it is reasonable for Keene to argue that the State meant to imply Keene's guilt by reference to his prior imprisonment. But, even assuming such was the State's intent, we believe the harmful effect to have been negligible at most. The implication was subtle and was communicated in a single sentence.

The second and third comments both relate to the law and can be considered together. The State described its burden of proof—the beyond a reasonable doubt standard—as "universal" and "not unreachable." The State also described Keene's presumed "cloak of innocence" to have been "shredded and ripped and pulled [off]" to reveal guilt.

This court has cautioned against attempts by counsel as well as trial judges to explain the reasonable doubt standard. (*People v. Speight* (1992), 153 Ill. 2d 365, 374.)

The danger is that, no matter how well-intentioned, the attempt may distort the standard to the prejudice of the defendant. If sufficient prejudice results, reversal is warranted. (See *Speight*, 153 Ill. 2d at 374 (describing the requisite degree of prejudice for reversal as "substantial").) The same holds for misstatements of law. Such misstatements in closing argument are often held remedied by jury instructions. (See *People v. Terry* (1984), 99 Ill. 2d 508, 517.) But proper direction may not undo the harm occasioned. See *People v. Weinstein* (1966), 35 Ill. 2d 467, 470 (describing the requisite harm for reversal as "manifest[ ] prejudice[ ]" where repeated misstatements of law destroyed the presumption of innocence and imposed a heavier burden than the law required).

Reviewing courts are, again, ill-equipped to assess what harm may have occurred. (See *Chapman*, 386 U.S. at 24, 17 L. Ed. 2d at 711, 87 S. Ct. at 828 (noting that the "harmless beyond a reasonable doubt" standard is one not ordinarily applied by reviewing courts).) Assessment of harm is often a blind exercise, for records cannot convey a "feel" for the emotional environment of the courtroom. That is why doubt as to the extent of harm is resolved in favor of the defense. (See *Weinstein*, 35 Ill. 2d at 472.) No exhaustive list of factors exists for measuring how much doubt may exist or how much prejudice resulted. The degree of inaccuracy of the commentary (see, *e.g.*, *Speight*, 153 Ill. 2d at 374) as well as the number of times the jury is made to hear it (see, *e.g.*, *Weinstein*, 35 Ill. 2d at 470) are, however, relevant.

The State here did not suggest that the standard of proof was a *pro forma* consideration (see *People v. Eddington* (1984), 129 Ill. App. 3d 745, 780) or that the defense bore the burden of proof (see *People v. Starks* (1983), 116 Ill. App. 3d 384, 395). In those respects, at least, the State's commentary was not inaccurate. That

is not true of the theatrical description of the stripping away of Keene's presumption of innocence. The statement was wrong. Keene enjoyed the benefit of the presumption until the point during deliberation when the jury concluded that there existed proof of guilt beyond a reasonable doubt. (See generally *People v. Viser* (1975), 62 Ill. 2d 568, 585-86.) Even so, to its limited credit, the State did not use repeated references to either the burden of proof or the presumption of innocence. We believe that that ameliorated the extent of harm.

In the final comments Keene cites, the State referred to Hoover's testimony as being consistent with what Hoover told police on the day he was arrested. The result, Keene argues, underscored improperly the idea that Hoover was a credible witness. The State does not contend that a basis existed for the comments. (See *People v. Powell* (1973), 53 Ill. 2d 465, 474-75.) Instead, the State answers that the reference did not detail what exactly Hoover had originally told the police.

True enough. But the commentary is not, for that reason, made innocent, as the State would have it. Pointing out the fact that Hoover had given the police a statement, the State rhetorically asked the jury whether it had heard other versions of how the crimes "went down." More particularly, the State asked whether Hoover had ever said that Keene was not involved. The State provided the answers to its own questions. The jurors had not heard other versions, the State explained, because Hoover had never recounted different versions. Had Hoover done so, the State assured, the defense would have exposed the fact through cross-examination.

The implication was that Hoover was to be believed because what he testified to was what he had first told police. The commentary was improper. The question is whether it caused sufficient prejudice to warrant a new

trial. Again, repetition is a relevant concern. (See *People v. Emerson* (1983), 97 Ill. 2d 487, 501.) The concern is heightened when the repeated reference involves the prior consistent statement of a witness who provides all evidence of guilt. See *Emerson*, 97 Ill. 2d at 501-02 (holding such reference to be reversible error).

The State did, more than once, invite the conclusion that Hoover had been steadfast in relating a consistent version of events. Furthermore, Hoover's bargained-for testimony was critical to the State's case. But there was also, in Audrey Krueger's account of the events, other corroboration the effect of which was to highlight, quite properly, Hoover's credibility.

For the reasons stated above, we do not believe that the individual comments made during the State's rebuttal argument caused sufficient harm to have compromised the integrity of the entire guilt phase of the trial. Nor do we believe that the cumulative effect of the comments caused the adversary system to break down. Plain error being absent, there is no ground to excuse the procedural default.

Keene separately complains of comments made by the State in its closing argument at the second stage of the sentencing hearing. Generally, the State drew the conclusion that Keene, by his acts, had sealed his own fate. The effect of the comments, Keene says, was to shift improperly the responsibility of imposing the death sentence away from the jury in violation of the eighth amendment (U.S. Const., amend. VIII).

The comments were not objected to contemporaneously, nor was issue taken in Keene's post-trial motion with their having been made. As above, the procedural default precluding review of the issue may be excused only as plain error.

We do not believe any harm arose from the State's attempt to underscore that Keene alone chose to com-

mit the crimes for which he stood convicted. If any harm could have arisen from such commentary, the harm was ameliorated by other comments by which the State impressed upon the jury that it ultimately was the determiner of Keene's fate. No grounds exist to excuse the procedural default regarding the commentary.

## Assistance of Counsel

David Snyders, a Freeport police detective, had prepared a report summarizing an interview he had conducted with Audrey Krueger. The State failed to disclose the report, but the defense learned of its existence during the course of the trial. The State was never able to locate the report. The trial judge determined that there had been no deliberate attempt to preclude the defense from seeing the report.

Prior to cross-examining Krueger, defense counsel questioned Snyders away from the jury about the interview. In the absence of the report, the defense wanted to learn whether Krueger had related a particular statement which she had attributed to Ehlers. The statement, revealed at the hearing on Keene's post-trial motion, would have diverged from Krueger's direct testimony. Snyders remembered Krueger's having said that Ehlers had told her that he, Ehlers, was responsible for both the shooting and the throat slitting of Peters. Snyders thought that Krueger's statement might have been tape-recorded during the interview. The statement, however, was not in the transcription of Krueger's statement.

Defense counsel was aware of the difficulties in admitting the statement as evidence, and the statement was not offered as proof.

Keene contends that the failure to present the statement in the first phase of the capital sentencing hearing amounted to ineffective assistance of counsel. Keene understands that the first concern for such a claim, that

counsel's performance was deficient (see *Strickland v. Washington* (1984), 466 U.S. 668, 689-91, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065-66), turns on whether Krueger's statement was admissible. Keene acknowledges that that concern turns on whether sufficient indicia of reliability existed to satisfy the statement-against-penal-interest exception to the hearsay rule. See *People v. House* (1990), 141 Ill. 2d 323, 390.

Analysis of the exception's application in *Chambers v. Mississippi* (1973), 410 U.S. 284, 300-01, 35 L. Ed. 2d 297, 311-12, 93 S. Ct. 1038, 1048-49, is cited as a four-factor test for determining trustworthiness. (See *House*, 141 Ill. 2d at 390.) Foremost, the statement must be self-incriminating or at least be against the declarant's interest. (*Chambers v. Mississippi*, 410 U.S. at 300, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048.) As a statement of such a nature is the bedrock for the exception, that factor, obviously, must be present. The other factors need not all also be present as a condition to admissibility. (See *House*, 141 Ill. 2d at 390.) The remaining factors are whether the statement was made spontaneously to a close acquaintance shortly after the crime, whether there is corroboration for the statement, and whether there existed an adequate opportunity to cross-examine the declarant. *Chambers v. Mississippi*, 410 U.S. at 300, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048-49.

Only the chief factor is satisfied here: Ehlers' purported statement would certainly have been incriminating.

As Ehlers' girlfriend, Krueger would be a close acquaintance. However, no time frame was established for when Ehlers supposedly made the statement to her. There might be reason, as Keene suggests, to fault defense counsel for that failure. But larger problems are present in the remaining factors making further scrutiny of the point unnecessary.

Keene argues that Ehlers' purported statement was corroborated by Hoover's testimony. The logic: Ehlers' supposed admission that he slit Peters' throat is believable because the other half of Ehlers' supposed admission—that he shot Peters—was corroborated by Hoover. Keene points out that only Hoover's statement that Keene had said he, Keene, had slit Peters' throat is contradictory.

The argument is selective of the worth of Hoover's testimony. First, Hoover's believability would be championed for what corroborative value it might hold. At the same time, Hoover's believability would be discounted on the very fact for which admissibility of Ehlers' supposed statement is argued: who slit Peters' throat. The argument cannot run both ways. In fact, though Hoover's testimony would corroborate Ehlers' supposed admission that he, Ehlers, shot Peters, the same testimony offers nothing to corroborate the supposed admission that Ehlers slit Peters' throat. It is of no consequence that other evidence would accommodate acceptance of Ehlers' admissions as fact; corroboration, not consistency, is the operative concern.

Finally, Keene concedes that it is unlikely that Ehlers could have been cross-examined. As a codefendant, Ehlers would almost certainly have invoked his fifth amendment right not to incriminate himself.

There is little indicia of trustworthiness in the statement Ehlers purportedly made to Krueger. There is, therefore, an insufficient basis for the statement-against-penal-interest exception to the hearsay rule by which the statement could be admissible. Without a basis for admissibility, there is no ground to argue that defense counsel should have challenged Krueger on cross-examination as to whether she had made the statement or otherwise sought to present it. Without a basis to find counsel's performance deficient, the ineffective-assistance claim must fail.

### Jury Instructions

The defense sought to have four Illinois pattern instructions read to the jury for the first, death-eligibility, stage of the sentencing hearing. The instructions pertained to witness credibility. Specifically, the instructions addressed testimony relating to prior consistent statements, prior convictions, identification, and statements of accomplices. (See Illinois Pattern Jury Instructions, Criminal, Nos. 3.11, 3.12, 3.15, 3.17 (3d ed. 1992).) The jury had been instructed on those points at the guilt phase of trial the day earlier. For that reason, the trial judge refused the defense request to have the jury reinstructed.

Keene complains that the refusal was an abuse of discretion. The State relies on the fact that the specific instructions regarding witness credibility were given during the guilt phase. But that point, Keene observes, could support his own argument. The logic: if it can be assumed that the jury remembered the guilt-phase instructions, the fact that they were omitted at the eligibility phase could lead the jury to conclude that the same rules did not govern.

Because, again, Keene did not include in his post-trial motion the argument now asserted, the first concern is whether the merits of the claim may be addressed.

Our Rule 451(c) provides that "substantial defects" in jury instructions "are not waived by failure to make timely objections." (134 Ill. 2d R. 451(c).) The rule offers a remedy for "grave" errors with regard to instructions in the same manner as Rule 615(a) offers a remedy for plain errors generally. (See *People v. Roberts* (1979), 75 Ill. 2d 1, 12-14.) That is, as with Rule 615(a), under Rule 451(c) a procedural default will not bar review of an error in jury instructions involving a substantial right if to honor the bar would work fundamental unfairness. (See *People v. Jenkins* (1977), 69 Ill. 2d 61, 66 (noting

that the rule applies only "[w]here there are such grave errors in instructions so as to affect that very important consideration, justice"); see also Ill. Ann. Stat., ch. 110A, par. 451, Historical & Practice Notes, at 713 (Smith-Hurd 1985) (acknowledging the restrictive construction of the rule).) And, as in the analysis of plain error under Rule 615(a), Rule 451(c) has been interpreted as contemplating a separate basis to determine fundamental unfairness where the evidence in the case is closely balanced. See *Roberts*, 75 Ill. 2d at 14.

Rule 451(c) is not expressly addressed to the type of procedural default arising here, the failure to include an issue in a written post-trial motion. The rule is expressly addressed to the failure to make a timely trial objection. But the point is immaterial. Rule 451(c) and Rule 615(a) are construed identically. Even if no chance of excusing the bar could exist under the language of Rule 451(c), plain error would remain an avenue for relief pursuant to Rule 615(a): jury instructions are recognized as implicating substantial rights. (See *People v. Thurman* (1984), 104 Ill. 2d 326, 329.) Concern for whether fundamental unfairness resulted exists because such rights are implicated; the case is not otherwise close factually.

The deliberation of a jury ignorant of a concern so elemental to its task as how to consider witness testimony could certainly work fundamental unfairness. The jury here, however, did receive instruction at the eligibility phase on the point, generally. The trial judge told the jury that it could take into account a witness' ability and opportunity to observe as well as age, memory, and manner while testifying. The jury was also informed it could consider any interest, bias or prejudice of the witness and the reasonableness of the testimony in the light of all of the evidence in the case.

The possibility exists that the omission of the more

specific guilt-phase credibility instructions might cause a jury recalling the instructions to conclude that they did not apply in the death eligibility phase. It is impossible to determine if that, in fact, happened. The question is whether the possibility is enough to compromise the very integrity of the death-eligibility determination. We believe that the general instructions given to the jury at the eligibility phase provided at least a minimum assurance that no fundamental unfairness resulted. No basis exists for excusing the procedural default.

## Death Penalty Instructions

Keene raised objections at both stages of the sentencing hearing regarding the understandability of the jury instructions for deliberating death. Keene based his objections on *Free v. Peters* (N.D. Ill. 1992), 806 F. Supp. 705. That decision was reversed in *Free v. Peters* (7th Cir. 1993), 12 F.3d 700, and we have rejected similar arguments (see *People v. Thompkins* (1994), 161 Ill. 2d 148, 198; *People v. Banks* (1994), 161 Ill. 2d 119, 147-48; *People v. Kokoraleis* (1994), 159 Ill. 2d 325, 333-34). We do so again.

## Death Penalty Statute

Keene challenges the constitutionality of the Illinois death penalty statute under the eighth amendment (U.S. Const., amend. VIII).

First, it is asserted that language outlining the second phase of the sentencing hearing "erects a far greater barrier" in the evaluation of mitigating evidence than other States' death statutes which the Supreme Court has approved. (See, *e.g., Walton v. Arizona* (1990), 497 U.S. 639, 111 L. Ed. 2d 511, 108 S. Ct. 3047.) The particular language directs the sentencer to elect death based on aggravating circumstances if evidence in mitigation is not "sufficient to preclude" it.

(720 ILCS 5/9—1(g) (West 1992).) Keene contrasts the Illinois statutory language with the language of the Arizona death statute. That statute limits the death penalty to cases where mitigation is not "sufficiently substantial to call for leniency." Ariz. Rev. Stat. Ann. § 13—703(E) (1989).

In fact, the Illinois and Arizona statutes merely employ different perspectives to outline the consideration of mitigating evidence. The considerations are otherwise materially the same. The Arizona statute states the consideration positively: sufficient mitigation is that which calls for leniency; death is precluded. The Illinois statute simply states the consideration in the negative: insufficient mitigation is that which cannot preclude death; leniency is not called for. The consideration of mitigating evidence directed under the Illinois statute is no different in that respect from the Arizona statute which the Supreme Court has approved. See *People v. Hampton* (1992), 149 Ill. 2d 71, 117.

Keene also states that the Illinois statute is vague in that it allows the sentencer to weigh "any other reason" than the statutory aggravating factors in deciding if to impose death. (720 ILCS 5/9—1(c), (e) (West 1992).) The argument has been previously considered and rejected. (See *People v. Todd* (1992), 154 Ill. 2d 57, 75.) No reason is offered, nor do we otherwise see one, for departing from that previous conclusion.

The Illinois death penalty statute is not unconstitutional for the reasons Keene advances.

Finally, Keene invites us to consider the collective effect of unsuccessful assertions that the Illinois death scheme does not adequately minimize the risk of arbitrariness. We rejected a similar contention in *People v. Williams* (1994), 164 Ill. 2d 1, 28-29, and do so again here.

CONCLUSION

The judgment of the circuit court of Stephenson

County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, March 12, 1996, as the date on which the sentence of death is to be carried out. Defendant shall be executed in the manner provided by law. (725 ILCS 5/119—5 (West 1992).) The clerk of this court shall send a certified copy of the mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE NICKELS, concurring:

I concur in the judgment of the court but write separately to address two issues: (1) the trial court's denial of funds for an expert pathologist, and (2) the trial court's failure to reinstruct the jury as to the accomplice instruction at the death eligibility stage of sentencing.

I

I concur in the majority's judgment concerning the denial of funds for a pathologist, but disagree with its reasoning. I believe that under the facts presented in the majority opinion, funds were necessary "to prove a crucial issue in the case." (*Glover*, 49 Ill. 2d at 82.) That crucial issue was whether the person who cut the victim's throat held the knife in his left or right hand. The issue was crucial to the defense because defendant is left-handed and would more likely hold a knife in his left hand than the other two right-handed co-felons. Moreover, the only other inculpatory evidence offered on this issue was the inherently weak accomplice testimony of Hoover. The determination that defendant slit the victim's throat was especially crucial to defendant because it was the sole aggravating factor found to have made him eligible for the death penalty.

The majority finds this issue not crucial to the defense because: (1) the pathologist did not testify that only a left-handed person could have cut the victim's throat; and (2) the primary evidence against defendant on this issue was Hoover's testimony. (169 Ill. 2d at 8-9.) This finding, however, overlooks the strength of the pathologist's testimony and the inferences drawn from it, as well as the inherent weakness of Hoover's accomplice testimony and the role the pathologist's testimony played in corroborating it.

While it is true the pathologist could not exclude the possibility that the knife was wielded with the right hand, the pathologist testified "to a reasonable degree of medical certainty" that the knife was held in the offender's left hand. Moreover, the inference drawn from the pathologist's testimony is clear in the record from the comments of the trial judge: "I think the doctor's testimony [on direct examination] *** was that it would have been by a left-handed person." The pathologist's testimony thus left the strong inference that a left-handed person had slit the victim's throat.

The State's only other evidence to prove defendant slit the victim's throat was the testimony of Hoover, an accomplice. Accomplice testimony is to be viewed with suspicion due to its "inherent weaknesses, being testimony of a confessed criminal and fraught with dangers of motives such as malice toward the accused, fear, threats, promises or hopes of leniency, or benefits from the prosecution." (*People v. Holmes* (1990), 141 Ill. 2d 204, 242, citing *People v. Hermens* (1955), 5 Ill. 2d 277, 285.) Hoover, in fact, had a strong motivation to testify for the State and against defendant: he received a 40-year sentence in exchange for his testimony and in the process exculpated himself from the throat slitting. The State's pathologist corroborated Hoover's inherently weak testimony. An expert pathologist testifying

for defendant might very well have discredited the State's pathologist and convinced the jury that reasonable doubt existed as to who cut the victim's throat. Thus, the issue was crucial for defendant.

While I disagree with the majority's reasoning, I do nonetheless agree that the trial court's denial of funds to retain an expert pathologist at the time the request was made was not error. Prior to trial and before answering discovery, defendant filed a *pro se* motion for experts that included a request for a pathologist. At the hearing on the motion, defendant informed the court that he needed a pathologist because (1) the State sought to prove that defendant had slit the victim's throat, and (2) a pathologist would determine whether a left-handed or right-handed person had slit the victim's throat. Defendant argued that he would use the pathologist's report to prove that he did not slit the victim's throat. However, defendant did not specify how a pathologist could prove he did not cut the throat: defendant did not inform the court that (1) he was left-handed and the other two co-felons were right-handed, or (2) he believed the pathologist would conclude that a right-handed person cut the victim's throat. Moreover, the record does not reflect that the trial court knew the specifics of defendant's theory at this time.

The trial court found defendant's motion premature and noted defendant had not alleged any specific defenses at that time which would require expert testimony. Thus, the court found it appropriate to deny the motion until defendant raised such a defense. Defendant and standby defense counsel, who later assumed control of defendant's case, never raised this issue again during trial.

I therefore concur in the majority's decision because the trial court found only that defendant had not yet, at that preliminary stage of the proceedings, shown that

such an expert was necessary to prove a crucial issue in the case. In doing so, the court suggested that defendant raise the issue at some later point in the proceedings when it would be clearer why such an expert was needed. Defendant, having never raised the issue again until after trial, and having never fully presented the issue to the court until after trial, cannot now complain of the trial court's decision.

## II

Concerning the waiver of the accomplice instruction at the death eligibility phase, I believe the trial court should have reinstructed the jury as to accomplice testimony. I do not agree with the majority that the general witness credibility instructions ensured that fundamental fairness resulted. However, based on facts not discussed in the majority opinion, I agree that no fundamental unfairness resulted in this case.

During the jury instruction conference, the trial court noted that the IPI committee comments did not address whether the jury should be reinstructed as to accomplice testimony at the eligibility phase of a death penalty hearing. The trial judge refused to give the instruction again because he thought it would be repetitive. However, the trial court informed defense counsel that it would be proper to argue to the jury that it was to follow the law as given during the guilt-innocence phase and to argue that the accomplice instruction still applied to Hoover's testimony. Defense counsel did so, informing the jury that the accomplice instruction given during the guilt-innocence phase was still the law at the eligibility phase and arguing that Hoover's testimony should be viewed with suspicion. For this reason, I believe that fundamental fairness was met for purposes of waiver.

I therefore concur in the judgment of the court.

JUSTICE HARRISON joins in this concurrence.