2023 IL App (2d) 210600-U
No. 2-21-0600
Order filed February 15, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lee County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-224 |
| ROBERT A. TAMBLYN, | ) ) | Honorable Jacquelyn D. Ackert, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice McLaren and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  At defendant's sex-assault trial, (1) the State's comment that the victim's account of the incident was uncontradicted was not intended to call attention to defendant's failure to testify in his own defense and (2) defense counsel was not ineffective in cross-examining the victim, where (a) counsel elicited a damaging admission from the victim and (b) the brief and unintrusive nature of the cross-examination was consistent with defendant's theory that he had no sexual contact with the victim and with counsel's reasonable decision not to alienate the jury by making the victim unnecessarily uncomfortable.

¶ 2    Defendant, Robert A. Tamblyn, appeals his convictions of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2016)) and criminal sexual abuse (720 ILCS 5/11-1.50(a)(2) (West 2016)), contending that (1) the State improperly commented during closing argument on his

refusal to testify and (2) his trial counsel was ineffective in cross-examining the victim, L.J. We affirm because (1) the State's comment was neither improper nor prejudicial and (2) trial counsel was not deficient in his cross-examination and, even if he were, there was no prejudice.

¶ 3                                    I. BACKGROUND

¶ 4      The State charged defendant by information with (1) one count of aggravated criminal sexual assault for committing an act of sexual penetration with L.J. while knowing that she was unable to understand the nature of the act or to knowingly consent and also causing her bodily harm by infecting her with a sexually transmitted disease (720 ILCS 5/11-1.30(a)(2) (West 2016)), (2) one count of criminal sexual assault for committing an act of sexual penetration with L.J. while knowing that she was unable to understand the nature of the act or to knowingly consent (720 ILCS 5/11-1.20(a)(2) (West 2016)), and (3) one count of criminal sexual abuse for placing his penis on L.J. for his sexual gratification while knowing that L.J. was unable to understand the nature of the act or to knowingly consent (720 ILCS 5/11-1.50(a)(2) (West 2016)).

¶ 5      The following facts were established at defendant's jury trial. On May 24, 2017, defendant stopped at the home of a business associate and friend, Brian Beer. Because it was Beer's birthday, the two men shared two bottles of wine. At around 6:20 p.m., defendant called his wife, Denise Mock, at her office and asked if she would pick up a bottle of wine and join him and Beer at Beer's house. Mock then asked L.J., who worked for her, if she wanted to come along. Mock described L.J. as a colleague and friend with whom she socialized about once a month.

¶ 6      L.J. and Mock drove separate vehicles to Beer's house. On the way, they stopped at a liquor store and bought a bottle of wine and a bottle of Irish Mist liqueur. Although Beer testified that both women appeared intoxicated when they arrived, L.J. testified that they did not drink before arriving.

¶ 7    After L.J. and Mock arrived, the four drank and socialized in the house. At one point, the foursome went to an upstairs music studio in Beer's barn. Mock testified that, because of defendant's back pain, she and Beer had to help defendant up and down the stairs. According to Beer, defendant had difficulty descending the stairs from the studio. At around 9:30 p.m., Cindy Prohl, Beer's girlfriend, arrived. According to Prohl, defendant had back pain, had difficulty getting out of chairs, and had "sat down on his butt" to descend the stairs from the studio.

¶ 8    According to Mock, L.J. consumed at least two glasses of Irish Mist. At about 8:30 p.m., when Mock went to refill her glass, she discovered that the Irish Mist bottle was empty. L.J. could not recall how much she drank but testified that she was "pretty intoxicated" and that it was difficult for her to walk straight.

¶ 9    At around 10 to 10:15 p.m., Mock told defendant that they would leave after one more song. After the song, defendant, Mock, and L.J. prepared to leave. L.J. was wobbly and stumbling. Mock helped L.J. down the stairs from the studio because she was leaning on the wall. When Mock asked L.J. if she was okay to drive, L.J. said no and tossed Mock the keys. Mock was worried about defendant's back pain, so she and defendant decided to leave defendant's truck there. Mock then drove defendant and L.J. to Mock and defendant's house. Beer followed in L.J.'s car, and Prohl drove her vehicle to give Beer a ride home.

¶ 10    They arrived at Mock and defendant's house around 10:45 p.m. L.J. stumbled out of the car, leaned forward, and threw up. After Mock walked defendant into the house and sat him on their bed, she went back outside to check on L.J. and saw her throwing up again. Mock then helped L.J. into the house and to the stairs. L.J. said that she could go up the stairs by herself. However, L.J. had difficulty opening the dog gate blocking the stairs. As she ascended the stairs, she leaned heavily on the wall. Once upstairs, she entered the guest bedroom.

¶ 11    Mock then went outside and saw that Beer and Prohl had arrived. When they came inside, defendant, wearing a bathrobe, was coming out of the first-floor bedroom to get a glass of water. Prohl and Beer played the piano in the sunroom. Mock then went to the bedroom to change clothes. Defendant walked into the bedroom with a glass of water. When Mock asked defendant where everyone was, he said that Beer and Prohl had gone home.

¶ 12    After returning home, Beer could not find his cell phone, so he drove back to defendant's house. When he arrived, the lights were on, so he opened the front door and announced that he was there looking for his phone. Beer remained on the first floor. Not finding his phone after a quick search, he left. He was in the house about 20 seconds.

¶ 13    At around 11:05 p.m., after chatting with defendant for a few minutes, Mock left the bedroom to turn off the lights in the living area. She noticed that someone had written "Cindy was here" with a finger in the dust on the piano. According to Mock, she took a photo of the dusty message and sent it to Beer at 11:11 p.m. When asked on cross-examination if she still had the photo, Mock said she had given it to defense counsel. Because she was embarrassed about the dusty piano, Mock returned to the bedroom and began arguing with defendant about his failure to keep the house clean. According to Mock, the argument lasted until about 3:05 a.m., the last time she remembered looking at the clock before falling asleep. According to Mock, defendant never left the bedroom between "the time that [they] went to bed" (which, apparently, was when she returned to the bedroom after photographing the piano at 11:11 p.m.) and 3:05 a.m. They had three dogs who spent the night in the first-floor living room. The dogs were very excitable. A person would have to cross the living room to reach the stairs leading to the second-floor guest bedroom.

¶ 14    L.J. testified that she had gotten sick in the driveway, felt miserable, and could not recall getting upstairs to bed. At some point in the night, L.J. awoke to find defendant performing oral sex on her. Her pants and underwear had been pulled down around her ankles. As he was performing oral sex, defendant said something like "come on or that's it[.]" L.J. did not respond. Defendant's tongue contacted L.J.'s vagina. According to L.J., she was soberer then than when she went to bed. After performing oral sex on L.J., defendant stood with his penis next to L.J.'s face. He then grabbed her head with his hand and pulled it toward him. With one hand on her head and the other on his penis, defendant pressed his penis toward L.J.'s mouth and said "come on." L.J. denied that defendant ever asked her to have sex or that she ever told him that she wanted to be intimate with him. L.J. then performed oral sex on defendant because she wanted him to go away. After he "finished," he tied his robe and left the room.

¶ 15    After defendant left the room, L.J. lay there, nauseated. At around 5:30 a.m., defendant returned to L.J.'s room. He reached under the blankets, discovered that her pants were back on, commented that she had gotten dressed, and then left. After defendant left, L.J. gathered her things and went home.

¶ 16    About a week later, L.J. saw defendant at her workplace. According to L.J., defendant said that he was "sorry for being such a barbarian the other night." L.J. responded, "I'm f*** pissed at you. How could you do that to your wife and to me? I was intoxicated."

¶ 17    On cross-examination, defense counsel told L.J. that he had "a couple of very quick questions for [her]" and that he "[did not] want to make this any more uncomfortable than it has to be." Counsel then reminded L.J. that she had testified that she did not recall what time defendant first woke her up. He then asked her if she told the police in June of 2017 that she thought the incident occurred between 12:15 a.m. and 1:15 a.m. and that, afterward, she immediately went

back to sleep until about 5 a.m. L.J. admitted that she had said this to the police and based the times on a readout from her Fitbit that monitored when she was asleep and awake. Counsel asked L.J. no further questions on cross-examination.

¶ 18    According to Mock, two days after L.J. spent the night, Mock and L.J. flew to Cancun to attend Mock's sister's wedding. L.J. spent Memorial Day weekend with Mock and her family at the wedding. According to Mock, she and L.J. had a good conversation over the weekend, and L.J. asked how defendant's back was feeling. Mock described L.J. as engaging, lively, and having a sense of humor during the trip. L.J. did not seem "dispossessed," "concerned[,] or distracted." L.J. never mentioned any inappropriate behavior by defendant. On the way home, L.J. continued to act normally.

¶ 19    On cross-examination, Mock testified that, on the Sunday following the trip, L.J. asked Mock to her house. When L.J. related the incident involving defendant, Mock was stunned. Mock told her to contact "Rockford sexual assault and report [the incident] as a crime." Several days later, Mock told L.J. not to contact her regarding the incident because her civil attorney had advised that the two have no contact. Mock denied hearing Beer return to the house looking for his cell phone.

¶ 20    According to Mock, she wrote detailed notes of the events of that evening. Mock composed the notes the same day L.J. informed Mock of defendant's conduct. At that point, Mock was still "able to vividly recall all of the details." Mock testified that she had provided those notes to defense counsel. At that point, the State and defense counsel approached the bench, and the trial court sent the jury out. The State noted that, despite Mock's testimony that she had provided the photo of the dusty piano and her notes to defense counsel, neither item had been disclosed to the State. The State added that it did not think defense counsel had intentionally failed to disclose

them. The court allowed the State to further question Mock about whether she had actually provided the photo and notes to defense counsel. According to Mock, she had emailed the photo and notes to defense counsel. Defense counsel then explained that he had received several emails from Mock, but they contained only work-related materials, not the photo or notes. Upon further questioning by the State, Mock admitted that she might have emailed the photo and notes to her civil-case counsel, not defense counsel.

¶ 21    In rebuttal, Prohl testified that she and Beer had been at Mock and defendant's house before the date of the incident when Beer was caring for their dogs. It was then that Beer wrote "Cindy was here" in the dust on the piano.

¶ 22    Defendant had opted not to testify. During defendant's closing argument, counsel reminded the jurors:

> "[Y]ou've agreed that you cannot consider the fact that [defendant] is applying and using his right under the Fifth Amendment to our Constitution to not take the stand, and I believe that [the trial court] will instruct you that the fact that [defendant] did not testify must not be considered by you in any way in arriving at your verdict."

Counsel further argued that defendant "absolutely denies that [the incident] ever took place." Finally, counsel reiterated that defendant did not have to prove anything and was protected by the presumption of innocence.

¶ 23    In rebuttal argument, the State noted that defendant was arguing that the incident never occurred. The State then said, "The evidence is unrebutted. [L.J.] sat in that chair and said that this happened. Did anybody ever say it didn't? No."

¶ 24    At this point, defense counsel asked for a mistrial. In doing so, he argued that the State's remark that the evidence was unrebutted was an improper comment on defendant's exercise of his

right to remain silent, because "[n]obody [could] rebut what [L.J.] said in that room except [defendant]." The State replied that defendant was not the only person who could have rebutted L.J.'s account.

¶ 25    The trial court denied the motion for a mistrial. After the close of the evidence, the court instructed the jury that "[t]he fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict."

¶ 26    The jury found defendant not guilty of aggravated criminal sexual assault and guilty of criminal sexual assault and criminal sexual abuse. The trial court sentenced to consecutive prison terms of 7 years for criminal sexual assault and 30 months for criminal sexual abuse. Following the denial of his motion for a new trial, defendant filed this timely appeal.

¶ 27                                          II. ANALYSIS

¶ 28    On appeal, defendant contends that (1) the State improperly commented during rebuttal argument on defendant's decision not to testify, and (2) his trial counsel was ineffective for failing to meaningfully cross-examine L.J.

¶ 29    We first address whether the State improperly commented on defendant's exercise of his right not to testify. In doing so, we note an apparent conflict within the appellate court over the standard of review for this issue. See *People v. Donahue*, 2014 IL App (1st) 120163 ¶ 102 (comparing *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) (applying *de novo* review) with *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (using abuse-of-discretion review)). However, we need not resolve the apparent conflict here, as our conclusion is the same under either standard.

¶ 30    Turning to the merits, it is generally permissible for the State to point out in closing argument that evidence is uncontradicted. *People v. Keene*, 169 Ill. 2d 1, 21 (1995). The State may do so even where the defendant is the only person who could have provided contrary proof.

*Keene*, 169 Ill. 2d at 21. However, "[t]he State may not 'point the finger of blame directly at the defendant for his failure to testify when it was within his power to enlighten the jury.' " *Keene*, 169 Ill. 2d at 21 (quoting *People v. Mills*, 40 Ill. 2d 4, 9 (1968)). "Such prosecutorial design crosses the danger line marking the outer boundary of proper commentary." (Internal quotation marks omitted.) *Keene*, 169 Ill. 2d at 21. Put another way,

> "The prosecutor may comment on the uncontradicted nature of the State's case [citation], and, where motivated by a purpose of demonstrating the absence of any evidentiary basis for defense counsel's argument rather than a purpose of calling attention to the fact that [the] defendant had not testified, such argument is permissible [citation.]" *People v. Dixon*, 91 Ill. 2d 346, 350 (1982).

The appropriate test for determining whether a defendant's right to remain silent has been violated is whether the reference or comment was intended or calculated to direct the jury's attention to the defendant's failure to exercise his right to testify. *Dixon*, 91 Ill. 2d at 350.

¶ 31 Here, the State did not cross the line of inappropriate comment on defendant's exercise of his right to remain silent. After noting that defendant had argued that the incident never occurred, the State commented that (1) L.J. testified the incident *did* occur and (2) no one testified the incident *did not* occur. However, the State's comment did not suggest that defendant was the only one who could have denied that the incident occurred. Indeed, two aspects of *Mock's* testimony implied that the incident did not occur. First, Mock testified that defendant was in significant pain and unable to ascend or descend stairs because of his back condition. Mock thus implied that defendant was physically unable to commit the charged acts. Second, L.J. admitted to telling the police that the incident occurred between 12:15 a.m. and 1:15 a.m. Mock, however, testified that defendant was in the bedroom with her from 11:11 p.m. to 3:05 a.m. Accordingly, if Mock's

testimony was truthful, then defendant could not have assaulted L.J. in the upstairs bedroom during the time frame she gave the police. Thus, there was indeed evidence contradicting L.J.'s account. That being so, we read the State's comment that the evidence was unrebutted as merely a comment on the weakness of Mock's testimony and not a reference to defendant's failure to testify. Thus, it did not cross the line to become an improper argument.

¶ 32    Moreover, even if we read the State's comment to suggest that defendant did not rebut L.J.'s testimony by taking the stand himself, the State could properly do so, even though defendant was the only person who could have provided such contrary proof. See *Keene*, 169 Ill. 2d at 21. Significantly, the State did not directly point the "finger of blame" (*Keene*, 169 Ill. 2d at 21 (quoting *Mills* 40 Ill. 2d at 9)) at defendant for failing to testify or otherwise intend to call attention to defendant's failure to testify. The State made its comment simply to discuss whether the evidence showed that the incident had occurred. In that light, the State's comment was not intended to call out the defendant for not testifying.

¶ 33    Notably, even if a comment from the State exceeds the bounds of proper argument, we will not disturb the verdict unless the remark substantially prejudiced defendant, taking into account the comment's (1) content and context, (2) relationship to the evidence, and (3) effect on defendant's right to a fair and impartial trial. *People v. Johnson*, 208 Ill. 2d 53, 115 (2003). Applying these criteria to the facts of this case, we conclude that the State's comment here, even if improper, did not result in substantial prejudice to defendant and was not a material factor in his conviction.

¶ 34    First, any remote possibility that the jury considered the State's comment to be directed at defendant's failure to testify was mitigated by defense counsel's reminder to the jury that, in rendering their verdict, they were not allowed to consider in any way defendant's failure to testify.

More importantly, the trial court instructed the jury that, in arriving at a verdict, they must not consider in any way defendant's failure to testify. See *People v. Tapley*, 2020 IL App (2d) 190137, ¶ 81 (jury presumed to follow trial court's instructions); see also *Dixon*, 91 Ill. 2d at 351 (noting that, because the trial court instructed the jury not to consider the defendant's failure to testify in arriving at their verdict, the State's comment did not deprive the defendant of a fair trial). Thus, the instructions to the jury mitigated any possibility that defendant was denied a fair trial.

¶ 35 Second, the evidence was not closely balanced. A police officer testified that, when he executed a search warrant to draw a sample of defendant's blood for a herpes test, defendant admitted he had herpes and said he planned to claim that L.J. transmitted it to him. Further, L.J. testified that defendant apologized to her after the incident "for being such a barbarian." That testimony was significant to the State's case. Further, Mock testified that defendant was wearing a robe, which was consistent with L.J.'s testimony that, after having sexual contact with L.J., defendant tied his robe. Although Mock testified that she argued with defendant about the dusty piano after first discovering the dust that evening, Prohl, a disinterested witness, testified in rebuttal that Beer had written in the dust sometime before the night of the incident. Although defendant makes much of L.J.'s failure to say anything about the incident during the trip with Mock, L.J. told Mock about the incident a week later and promptly reported it to the police. Her failure to say anything during the trip—a destination wedding for Mock's sister—was entirely understandable.

¶ 36 In sum, the State's comment did not result in substantial prejudice to defendant under these circumstances and, thus, does not warrant reversal of his convictions. See *Johnson*, 208 Ill. 2d at 117.

¶ 37 We next decide whether defendant's trial counsel provided ineffective assistance when he cross-examined L.J. He did not.

¶ 38    To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Additionally, the defendant must establish prejudice by showing a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A defendant must satisfy both prongs, and failing to establish either is fatal to an ineffective-assistance claim. *Strickland*, 466 U.S. at 687. If a lack of prejudice can resolve an ineffective-assistance claim, a reviewing court need not decide if counsel's performance was deficient. *People v. Gaciarz*, 2017 IL App (2d) 161102, ¶ 50.

¶ 39    Whether to cross-examine or impeach a witness is a matter of trial strategy, which will not support an ineffective-assistance claim. *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997). Moreover, how to cross-examine a particular witness involves the exercise of professional judgment that is entitled to substantial deference. *Pecoraro*, 175 Ill. 2d at 326-27. Accordingly, a defendant can prevail on such an ineffectiveness claim only by showing that counsel's approach to cross-examination was objectively unreasonable. *Pecoraro*, 175 Ill. 2d at 327.

¶ 40    Here, defense counsel's trial strategy was to deny that the incident occurred. A large part of that strategy was Mock's testimony that defendant was in the bedroom with her from "the time that [they] went to bed" (which, apparently, was when she returned to the bedroom after photographing the piano at 11:11 p.m.) until 3:05 a.m. To use Mock's testimony to full advantage, counsel needed to refute L.J.'s testimony that she did not recall when the incident occurred. Counsel effectively did so by getting L.J. to admit that she had told the police that the incident happened between 12:15 a.m. and 1:15 a.m.—well within the time that Mock had testified defendant was with her. That was very effective cross-examination. Further, when counsel began

his cross-examination of L.J., he said he did not want to make her unnecessarily uncomfortable before the jury. Indeed, counsel kept the cross-examination brief and unintrusive. Counsel's approach—to avoid alienating the jury by making L.J. more uncomfortable—was certainly reasonable. Further, to ask L.J. about her level of intoxication, whether she consented to have sex, or her lack of any injuries would have made no sense considering that defendant was clearly claiming that he had no sexual contact with L.J. on the night in question. Thus, we cannot say that trial counsel was unreasonably deficient in his cross-examination of L.J.

¶ 41 Moreover, even if defense counsel were deficient, no prejudice resulted from his failure to further cross-examine L.J. As discussed, there was ample evidence of defendant's guilt.

¶ 42 Based on the foregoing, defendant has not established that the State violated his right to remain silent by its comment during closing argument that no one contradicted L.J.'s account. Nor has he established that trial counsel was ineffective in cross-examining L.J.

¶ 43                                   III. CONCLUSION

¶ 44 For the reasons stated, we affirm the judgment of the circuit court of Lee County.

¶ 45 Affirmed.